OPINION
{¶ 1} Defendants-appellants, Kevin Morton ("Morton") and his mother, Shirley White Harris ("Harris"), referred to hereinafter collectively as "appellants," appeal from the judgment of the Franklin County Court of Common Pleas, in which that court granted summary judgment in favor of plaintiff-appellee, Columbus Mortgage, Inc. ("CMI") and third-party defendants, Joseph Dennis ("Dennis") and Abe King ("King") (collectively referred to hereinafter as "appellees"), as to appellants' claims against appellees, asserted by way of a counterclaim, arising out of the sale, financing, and subsequent repossession of an automobile.
 {¶ 2} The following facts are gleaned from the record and are undisputed unless otherwise noted. CMI is a corporation engaged in the business of lending money. Dennis and King are allegedly responsible for the development and implementation of CMI's policies and procedures upon which appellants' claims are based.
 {¶ 3} On February 12, 2004, CMI sold to Morton a 1994 Cadillac Concourse that it had acquired when it repossessed the vehicle as a result of another customer's default on a loan collateralized by the vehicle. CMI loaned Morton the money he needed in order to purchase the vehicle. Morton signed a note and security agreement giving CMI a security interest in the vehicle, and Harris cosigned the note. Morton agreed to pay the sum of $7,050.42 in 36 monthly payments. Shortly after the purchase, the vehicle needed repairs, which Morton could not afford. On July 28, 2004, he and CMI, along with Harris as cosigner, entered into a replacement loan agreement in which CMI loaned Morton additional money for the needed repairs, and this amount was added to the *Page 3 
principal amount of the original loan. This loan also was to be repaid in 36 monthly payments, the first of which was due August 28, 2004. This transaction, too, resulted in the execution of evidence of indebtedness in the form of a note and security agreement.
 {¶ 4} Morton failed to make any payments and, following notification to Morton of his delinquency, on October 7, 2004, CMI repossessed the vehicle. The vehicle's engine was cracked and in need of repair. CMI provided Morton with a written notice that it would sell the vehicle at a public sale to take place October 22, 2004. CMI claims that it held the public sale but that it received no bids on the vehicle. However, it nonetheless applied a credit in the amount of $2,000 against Morton's balance, representing the N.A.D.A. Official Used Car Guide estimated loan value of $3,400, minus $1,400, which was the amount that CMI guessed it would cost to repair the engine. It later spent $3,000 to repair the engine and subsequently sold the vehicle for $4,995.
 {¶ 5} On January 3, 2005, CMI filed suit in the Franklin County Municipal Court against appellants, seeking recovery of the balance due on the July 28, 2004 loan agreement. Appellants filed a counterclaim that exceeded the jurisdictional limit of the municipal court, whereupon the case was transferred to the Franklin County Court of Common Pleas. On June 20, 2005, appellants filed their first amended counterclaim, and asserted three claims.
 {¶ 6} In their first claim, appellants alleged that appellees committed an unlawful, unfair and deceptive practice under the Ohio Consumer Sales Practices Act ("CSPA"), when CMI sold a vehicle to Morton without being licensed as an automobile dealer, and *Page 4 
sought all remedies provided by the CSPA, including injunctive relief and damages. In their second claim, appellants alleged that appellees violated the usury provisions of the Ohio Retail Installment Sales Act ("RISA"), when CMI charged Morton more than the maximum annual percentage rate of interest allowable under RISA, and sought recovery of any finance charges paid in excess of the rate that would otherwise apply. In their third claim, appellants alleged that CMI's notice of repossession issued to appellants did not contain the language required by RISA and by Ohio's codification of the Uniform Commercial Code ("UCC"), and, further, that CMI's sale of the vehicle was not commercially reasonable under Article 9 of the UCC.
 {¶ 7} On January 20, 2006, appellees filed a motion for summary judgment as to all of the claims asserted in the first amended counterclaim. On March 10, 2006, appellants filed a motion for leave to file a second amended counterclaim, seeking to add new defendants and an additional claim. On June 2, 2006, the court of common pleas granted CMI's motion for summary judgment. Subsequently, CMI dismissed its claim pursuant to Civ.R. 41, whereupon appellants instituted this appeal. They advance four assignments of error for our review, as follows:
 ASSIGNMENT OF ERROR ONE
 The Trial Court Committed Prejudicial Error in granting CMI's Motion for Summary Judgment.
 ASSIGNMENT OF ERROR TWO
 The Trial Court Committed Prejudicial Error by Ruling on the Issue of Credibility in its Decision. *Page 5 
 ASSIGNMENT OF ERROR THREE
 The Trial Court Abused its Discretion by Failing to Grant or even Rule upon Morton's Motion for Leave to File a Second Amended Class Action Counterclaim.
 ASSIGNMENT OF ERROR FOUR
 The Trial Court Improperly Relied on the Affidavit of Richard Shultz and his Opinion Concerning the Annual Percentage Rate and how it Relates to RISA.
 {¶ 8} We review the trial court's grant of summary judgment de novo.Coventry Twp. v. Ecker (1995), 101 Ohio App.3d 38, 654 N.E.2d 1327. Summary judgment is proper only when the party moving for summary judgment demonstrates: (1) no genuine issue of material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds could come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, when the evidence is construed in a light most favorable to the non-moving party. Civ.R. 56(C); State ex rel. Grady v. State Emp.Relations Bd. (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343. We review questions of law de novo. Nationwide Mut. Fire Ins. Co. v. Guman Bros.Farm (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684, citing Ohio BellTel. Co. v. Pub. Util. Comm. (1992), 64 Ohio St.3d 145, 147,593 N.E.2d 286.
 {¶ 9} In granting summary judgment in favor of appellees on appellants' claims, the trial court found: (1 ) the transaction between the parties is not subject to RISA; (2) CMI is not subject to the CSPA, and, alternatively, CMI did not violate the CSPA because it was not required to obtain an automobile dealer's license; and (3) CMI disposed of the *Page 6 
repossessed vehicle in a commercially reasonable manner. Appellants challenge each of these findings under their first assignment of error.
 {¶ 10} Appellants' second claim was based upon the allegation that CMI violated R.C. 1317.061, which is part of RISA and provides, "a retail seller * * * may contract for and receive finance charges or interest at any rate or rates agreed upon or consented to by the parties to the retail installment contract * * * but not exceeding an annual percentage rate of twenty-five per cent." A "retail seller" means "a seller that is a party to a retail installment sale." R.C. 1317.01(I).
 {¶ 11} R.C. 1317.01(A) provides, in pertinent part:
 "Retail installment sale" includes [1] every retail installment contract to sell specific goods, [2] every consumer transaction in which the cash price may be paid in installments over a period of time, and [3] every retail sale of specific goods to any person in which the cash price may be paid in installments over a period of time. * * *
 {¶ 12} Pursuant to the plain language of R.C. 1317.01(A), the usury provision of R.C. 1317.061 applies to "retail installment contracts" to sell specific goods, "consumer transactions" in which the cash price is payable in installments over time, and retail sales of specific goods in which the cash price may be paid in installments over time. A "retail installment contract" is defined as, "any written instrument that is executed in connection with any retail installment sale and is required by section 1317.02 of the Revised Code or is authorized by section1317.03 of the Revised Code, and includes all such instruments executed in connection with any retail installment sale." R.C. 1317.01 (L). R.C.1317.02 requires that retail installment sales be reduced to a writing and R.C. 1317.03 allows the *Page 7 
seller to require the buyer to sign evidence of indebtedness, such as a promissory note and security agreement.
 {¶ 13} R.C. 1317.01(P) defines "consumer transaction" for RISA purposes, in pertinent part, as "a sale, lease, assignment, or other transfer of an item of goods, or a service, except those transactions between persons, defined in sections 4905.03 and 5725.01 of the Revised Code, and their customers * * * to an individual for purposes that are primarily personal, family, or household." "Dealers in intangibles" are one of the groups of persons defined in R.C. 5725.01. Accordingly, transactions involving dealers in intangibles are specifically excepted from the definition of consumer transactions within the meaning of RISA.
 {¶ 14} R.C. 5725.01(B)(1) provides:
 [A] "[d]ealer in intangibles" includes every person who keeps an office or other place of business in this state and engages at such office or other place in a business that consists primarily of lending money, or discounting, buying, or selling bills of exchange, drafts, acceptances, notes, mortgages, or other evidences of indebtedness, or of buying or selling bonds, stocks, or other investment securities, whether on the person's own account with a view to profit, or as agent or broker for others, with a view to profit or personal earnings. * * *
 {¶ 15} CMI falls within this definition. As such, the trial court found that the transaction between CMI and appellants did not constitute a "consumer transaction" for purposes of R.C. 1317.01(P). Having determined that the transaction did not fall under the second of the three categories of transactions enumerated in R.C. 1317.01(A), the trial court concluded that RISA was wholly inapplicable thereto. *Page 8 
 {¶ 16} Appellants argue that the transaction between the parties was a "purchase money loan," as that term is defined at R.C. 1317.01(Q), which constitutes a retail installment sale, subjecting CMI to R.C. 1317.061
even if CMI's status as a dealer in intangibles would take the transaction outside the definition of "consumer transaction." R.C.1317.01(Q) provides:
 "Purchase money loan" means a cash advance that is received by a consumer from a creditor in return for a finance charge within the meaning of the "Truth in Lending Act," 82 Stat. 146 (1968), 15 U.S.C.A. 1601 and regulation Z thereunder, which is applied in whole or substantial part to a consumer transaction with a seller, that either:
 (1) Cooperates with the creditor to channel consumers to the creditor on a continuing basis;
 (2) Is affiliated with the creditor by common control, contract, or business arrangement.
(Emphasis added.)
 {¶ 17} This language confines the definition of "purchase money loan" to certain loans made in connection with a "consumer transaction." As noted earlier, because CMI is a dealer in intangibles, this transaction cannot be deemed a consumer transaction within the meaning of RISA. Therefore, R.C. 1317.01(Q) is inapplicable to this case.
 {¶ 18} We also observe that the term "purchase money loan" appears in only two sections of RISA, to wit: R.C. 1317.031 and 1317.032. Both of those sections concern defenses by a buyer against a holder in due course. Potentially, "purchase money loans" are also encompassed within R.C. 1317.14, which uses the language, "or in any other agreement," but this section, too, deals with waiver of defenses against sellers and *Page 9 
holders in due course. There is no indication that the General Assembly intended all sections of RISA to apply to "purchase money loans." Therefore, even if the loan in the case at bar falls within the definition of "purchase money loan," we must assume that the General Assembly did not intend the usury provisions of R.C. 1317.061 to apply to such loans since that section does not refer to "purchase money loans."[1]
 {¶ 19} Appellants also cite Glouster Comm. Bank v. Winchell (1995),103 Ohio App.3d 256, 659 N.E.2d 330, a case from the Fourth Appellate District, for the proposition that the transaction at issue is a purchase money loan, which brings it, and CMI, within the purview of RISA, appellants argue. We note that Glouster does not even mention the term "purchase money loan" and that case did not involve defenses against a holder in due course.
 {¶ 20} Glouster does warrant examination, however, because the court in that case found that when the bank went beyond merely financing a purchase, and was also the seller of the repossessed mobile home to which it held title, it lost the protection conferred by its status as a "financial institution" (which status would take the transaction outside the definition of "consumer transaction") and nonetheless was a "retail seller" under R.C. 1317.01(I) because the transaction qualified as one of the other two types of *Page 10 
"retail installment sales" in R.C. 1317.01(A).
 {¶ 21} In the case of Haines v. Key Oldsmobile Co. (Oct. 28, 1997), Franklin App. No. 97APE06-750, this court had occasion to discuss theGlouster case. We ultimately distinguished Glouster from Haines becauseHaines involved an automobile lease arranged through a third-party dealer and did not involve a direct sale of a vehicle to which the mortgagee held title. But in doing so we observed:
 The RISA provision at issue in Glouster, R.C. 1317.01(A), included in its definition of "retail installment sale":
 "* * * ` "[1] every retail installment contract to sell specific goods, [2] every consumer transaction in which the cash price may be paid in installments over a period of time, and [3] every retail sale of specific goods to any person in which the cash price may be paid in installments over a period of time.
 Hence, while financial institutions were exempt from the definition of consumer transaction, they could be subject to RISA if the transaction fell under either number one or three above. The transaction in Glouster did fall within one of these and, therefore, the bank was not exempt.
Haines, 1997 Ohio App. LEXIS 4826, at *8. (Citations omitted.)
 {¶ 22} By its terms, RISA's usury provision contained in R.C. 1317.061
applies to "retail sellers." A "retail seller" means "a seller that is a party to a retail installment sale." R.C. 1317.01(I). Thus, in order to determine whether CMI is subject to R.C. 1317.061 with respect to the transaction in question, we must determine whether CMI was a "seller that is a party to a retail installment sale." If the transaction between CMI and Morton was a "retail installment sale" under any of the three definitions thereof contained in R.C. *Page 11 1317.01(A), then CMI is a retail seller and is subject to the usury provision in R.C. 1317.061.
 {¶ 23} We have already determined that the transaction does not meet the second definition, a "consumer transaction," because CMI is a "dealer in intangibles." But the transaction does meet the first and third definitions, which are a "retail installment contract to sell specific goods" and a "retail sale of specific goods to any person in which the cash price may be paid in installments over a period of time."
 {¶ 24} A "retail installment contract" is defined as, "any written instrument that is executed in connection with any retail installment sale and is required by section 1317.02 of the Revised Code or is authorized by section 1317.03 of the Revised Code, and includes all such instruments executed in connection with any retail installment sale." R.C. 1317.01(L). R.C. 1317.02 requires that retail installment sales be reduced to a writing and R.C. 1317.03 allows the seller to require the buyer to sign evidence of indebtedness, such as a promissory note and security agreement. The loan transaction at issue in this case involves a written instrument (a promissory note) and a security agreement and meets the definition of a "retail installment contract to sell specific goods" under R.C. 1317.01(A).
 {¶ 25} A "sale" consists in the passing of title from the seller to the buyer for a price. R.C. 1317.01(M) and 1302.01(A)(11). "Retail" means to dispose of specific goods to, or to acquire specific goods by, a person for use other than for purposes of resale. R.C. 1317.01(E). Thus, a "retail sale" under R.C. 1317.01(A) consists in the passing of *Page 12 
title to goods from the seller to the buyer for a price, for use other than for purposes of resale. In the loan transaction at issue in this case, title to the vehicle passed from CMI to Morton for a price, for use other than for purposes of resale. Therefore, it meets the definition of a "retail sale" under R.C. 1317.01(A).
 {¶ 26} Because the transaction involved herein meets the first and third definitions of "retail installment sale" contained in R.C.1317.01(A), CMI is a "retail seller" under R.C. 1317.01(I), and is subject to the usury provision of R.C. 1317.061.
 {¶ 27} The trial court found that CMI did not charge more than the statutory maximum 25 percent annual percentage rate and, thus, did not violate R.C. 1317.061. Specifically, the court relied upon the affidavit of Richard Shultz, who identified himself therein as a consultant to the automotive industry retained by CMI's counsel "to review the facts of this case and provide independent professional opinions, based on my specialized knowledge, experience, training, skill, and education in the automotive industry." (Shultz Affidavit, ¶ 2.)
 {¶ 28} Shultz opined, "to a reasonable degree of professional certainty," that:
 CMI charged Mr. Morton interest at an APR of 23.0% under the February 12, 2004 loan. The only difference between the interest APR of 23.0% that CMI charged Mr. Morton and the federal finance charge APR of 26.02% that CMI charged Mr. Morton is the $200 loan origination fee that was included in the principal amount of Mr. Morton's loan. If the $200 loan origination fee is not included in the federal finance charge calculation, the federal APR for Mr. Morton's loan is the same as the state interest APR: 23.0%.
 * * * *Page 13 
 The "Itemization of Amount Financed" from CMI's files for Mr. Morton (Bates No. X 00007) accurately states that Mr. Morton's "Total of Payments" for his loan consisted of an "Amount Financed" of $4,857.16 plus a "Finance Charge" for Federal Truth-In-Lending Act ("TILA") purposes of $2,193.26. The $4,857.16 "Amount Financed" consisted of $4,495 (The $4,995 sales price of the vehicle less Mr. Morton's $500 down payment), $337.16 for sales taxes, $15 for filing or recording fees, and a $10 fee for a credit check. The $2,193.26 of Finance Charges consisted of $1,993.26 of interest at an APR of 23.0% plus the $200 loan origination fee. The $1,993.26 of interest actually consisted of $1,911.50 of interest on the $4,857.16 "Amount Financed" plus some additional interest at an APR of 23.0% on the $200 loan origination fee.
 The attached Exhibit 1 is an amortization schedule that I prepared, which shows that both the $7,050.42 of "Total Payments," and the monthly payment amounts of $198.82 for the first month and $195.76 for each of the remaining 35 months, for Mr. Morton's February 12, 2004 loan, included the $200 loan origination fee.
 The $200 loan origination fee charged to Mr. Morton caused the federal "finance charge" APR to be higher than the state interest APR of 23.0%, because TILA requires the loan origination fee to be included as a "finance charge," instead of part of the "amount financed."
 * * *
 Even though the $200 loan origination fee charged to Mr. Morton resulted in a federal finance charge APR of 26.02%, the APR for the interest charged to Mr. Morton remained 23.0%. In fact, if the $200 loan origination is removed from the equation and not included in the APR calculation, the federal finance charge APR would have been the same as the interest rate APR of 23.0%.
 * * *
 If the $200 loan origination fee is eliminated from the equation, there is no federal "finance charge" in addition to *Page 14 
the $1,911.50 of total interest on the $4,857.16 amount financed. Therefore, without the $200 loan origination fee, the federal "finance charge" APR is the same as the state interest APR: 23.0%. As an additional way of verifying this, I again calculated the federal "finance charge" APR by using the APR tables of the Board of Governors of the Federal Reserve System attached as Exhibit 3, which confirmed that, if the $200 loan origination fee is not included in the APR calculation, the federal APR for Mr. Morton's loan is exactly 23.0%. The calculation is as follows: $1,911.50 finance charge times 100 divided by $4,857.16 amount financed equals $39.35. Reading across on the 36 payment line of the monthly APR tables, the exact amount of $39.35 is located in the 23.00% APR column.
(Shultz Affidavit, ¶ 11-18; emphasis sic.)
 {¶ 29} The trial court observed that Morton had presented no evidence contradicting the analysis contained in the Shultz affidavit and, on that basis, determined that there existed no genuine issue of fact with respect to whether CMI had violated the usury provision of RISA contained in R.C. 1317.061.
 {¶ 30} On appeal, appellants argue that since the face of each loan agreement indicates a Truth in Lending Act ("TILA") APR of 26.02 percent and 25.98 percent respectively, there can be no dispute that CMI charged a higher interest rate than allowed under RISA. This is because, appellants argue, the RISA interest rate is determined by the same method as interest under TILA. For support of this proposition, appellants direct our attention to the case of Ellis v. Hensley (Aug. 16, 1979), Cuyahoga App. No. 39126.
 {¶ 31} But Ellis does not support appellants' argument regarding the method of calculation under RISA. In Ellis, the consumer alleged that the lender had violated both RISA and TILA by failing to separately state the amounts of the "finance charge" and *Page 15 
"service charge"; that it had violated TILA and the CSPA by failing to clearly and conspicuously disclose the security interest it took, and that it violated Regulation Z, Section 226.8(c)(8)(ii), Title 12, C.F.R. by failing to disclose the "deferred payment price." The court inEllis did observe that TILA, by its own terms, requires state laws regarding disclosure of finance charges to be read consistently with federal regulations on disclosure of finance charges, and specifies that a state law requiring, inter alia, disclosure of the amount of a finance charge in any manner other than that prescribed in Section 226.4, Title 12, C.F.R., is inconsistent with TILA. But nothing in Ellis or in the TILA provisions to which it refers requires that the interest rate for purposes of RISA's usury provision be calculated in the same manner as the interest rate for purposes of TILA. Our research reveals no authority for such a proposition.
 {¶ 32} The trial court in the instant case had before it the loan agreements themselves, plus the Shultz affidavit, for purposes of determining whether CMI had violated R.C. 1317.061 by charging an annual percentage rate of interest higher than 25 percent. If the Shultz affidavit was appropriately considered, then we would agree with the trial court that CMI carried its initial burden, under Civ.R. 56, of demonstrating the absence of a genuine issue of fact with respect to this issue, and appellants failed to meet their reciprocal burden of demonstrating the existence of a genuine issue of fact.
 {¶ 33} This requires us to interrupt our discussion of appellants' first assignment of error and consider appellants' fourth assignment of error, in which they argue that the trial court improperly relied upon the Shultz affidavit. Specifically, appellants argue that the *Page 16 
trial court erred by assuming that Shultz was opining regarding whether CMI violated RISA when he merely opined as to what annual percentage rate CMI charged Morton. Appellants direct our attention to the fact that when the trial court introduced its discussion of the Shultz affidavit, it stated, "[w]ith regard to whether or not CMI violated R.C. § 1317.061 because of the amount of the APR of Morton's loan, Shultz opines as follows * * *."
 {¶ 34} Though appellants may have succeeded in drawing attention to a bit of imprecise drafting on the part of the trial court, they have not persuaded this court that Shultz's affidavit testimony was used improperly. It is undisputed that Shultz opined regarding the fact of what annual percentage rate of interest CMI applied to Morton's loan, and did not, as appellants correctly point out, opine as to whether CMI violated R.C. 1317.061. Thus, Shultz's affidavit testimony was appropriately confined to opinions regarding a disputed issue of fact and did not venture into legal conclusions, which are to be made by courts of law. Moreover, it is undisputed that Shultz is qualified to render the opinions contained in his affidavit. Consideration of the Shultz affidavit was entirely appropriate and we perceive no improper use of it by the trial court. Accordingly, appellants' fourth assignment of error is overruled.
 {¶ 35} Having determined that the Shultz affidavit was properly considered, we conclude, as noted earlier, that it served to demonstrate the absence of any genuine *Page 17 
issue of material fact as to whether CMI violated R.C. 1317.061. Accordingly, appellees were entitled to judgment as a matter of law on appellants' second claim.[2]
 {¶ 36} Part of appellants' third claim was based upon CMI's alleged violation of another part of RISA, to wit: R.C. 1317.12, which mandates that:
 Notwithstanding any agreement to the contrary in a retail installment contract made on or after the effective date of this section, if collateral for a consumer transaction is taken possession of by the secured party on default, the secured party shall, within five business days after taking possession, send to the debtor a notice setting forth specifically the circumstances constituting the default and the amount by itemization that the debtor is required to pay to cure the default. Any notice required by section 1309.611 or 1317.16 of the Revised Code may be included as part of the notice required by this section. A secured party who disposes of the collateral without sending notice required by this section may not recover the costs of retaking possession of the collateral and is not entitled to a deficiency judgment.
 {¶ 37} By the plain language of R.C. 1317.12, it applies only to "consumer transactions." As we noted earlier, the transaction between CMI and appellants was not a consumer transaction within the meaning of RISA. R.C. 1307.01 (P); 5725.01(B)(1). Accordingly, CMI was not subject to the notice requirements contained in R.C. 1317.12. Martin v.GMAC, 160 Ohio App.3d 19, 2005-Ohio-1349, 825 N.E.2d 1138, ¶ 47. *Page 18 
Therefore, the trial court correctly granted summary judgment to appellees with respect to this portion of appellants' third claim.
 {¶ 38} The trial court also rejected appellants' argument that CMI's Notice of Repossession violated R.C. 1309.614(A), finding that the notice satisfied the statute because it was patterned after the "safe harbor" provision in R.C. 1309.614(B). Neither appellants' merit brief nor its reply brief contains any argument specifically addressing this finding, as is required by App.R. 16(A)(7). Accordingly, pursuant to App.R. 12(A)(2), we decline to address this issue.
 {¶ 39} The remaining portion of appellants' third claim was based upon CMI's alleged violation of R.C. 1309.610, which provides, in pertinent part:
 (A) After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.
 (B) Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, at any time and place, and on any terms.
 {¶ 40} Compliance with R.C. 1309.610 is a condition precedent to recovery of a deficiency judgment and a creditor's failure to comply with the statute's requirements is an absolute bar to the recovery of a deficiency judgment. First Natl. Bank of Dennison, Inc. v. Grewell, Tuscarawas No. 03 AP 12 0095, 2004-Ohio-3986, ¶ 41, citing Liberty Bankv. Greiner (1978), 62 Ohio App.2d 125, 405 N.E.2d 317. *Page 19 
 {¶ 41} Appellants unsuccessfully argued below that CMI's disposition of the Cadillac Concourse was not commercially reasonable. As part of their first assignment of error, they argue that the trial court erred in reaching this result. First, appellants argue that the trial court incorrectly placed the burden of proof regarding commercial reasonableness upon them instead of upon CMI. We disagree.
 {¶ 42} It is true that when the debtor raises the issue of commercial unreasonableness, the secured party carries the burden of proof on the issue. R.C. 1309.626; Huntington Natl. Bank v. Elkins (1987),43 Ohio App.3d 64, 539 N.E.2d 1135. Moreover, notwithstanding the language of R.C. 1309.626, "[i]t is basic that regardless of who may have the burden of proof at trial, the burden is on the party moving for summary judgment to establish that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."Horizon Savings v. Wootton (1991), 73 Ohio App.3d 501, 504,597 N.E.2d 1150. Thus, since appellees were the parties moving for summary judgment, the burden was on them to establish the absence of a genuine issue of material fact. Our review of the trial court's decision reveals no misapplication of either of these standards.
 {¶ 43} Rather, in employing the proper standards, the trial court found that appellees had carried their burden of proving commercial reasonableness, and of proving an absence of a genuine issue of fact with respect thereto. The court further found that appellants had produced no contrary evidence that would render appellees' evidence unworthy of belief or would demonstrate the existence of a genuine issue of material fact. *Page 20 
 {¶ 44} R.C. 1309.627 provides guidelines for determining whether a disposition of collateral was commercially reasonable, and provides, in pertinent part:
 (A) The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner.
 (B) A disposition of collateral is made in a commercially reasonable manner if the disposition is made:
 (1) In the usual manner on any recognized market;
 (2) At the price current in any recognized market at the time of the disposition; or
 (3) Otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.
 {¶ 45} The affidavit and deposition testimony of Joe Dennis establishes that CMI held the sale on the date and time, and at the place, designated in the notice of sale. Dennis' affidavit, and Exhibit 13 to that affidavit, establish that on October 13, 2004, the day after the notice of sale was mailed, CMI advertised the sale of the automobile in the "Automotive Auctions Sales" section of the Columbus Dispatch classified advertisements.
 {¶ 46} Appellants argue that because the sale was not conducted as an "auction" with a licensed auctioneer, and because the vehicle was not actually on site at the time and place of the sale, the ultimate disposition of the collateral was not commercially *Page 21 
reasonable. However, there is no statutory requirement that the sale be an "auction" and Dennis explained in his affidavit that the vehicle was not on-site at the time of the sale because it could not be driven at that time; however, CMI had the vehicle available for inspection by bidders at a nearby storage lot.
 {¶ 47} But examination of the circumstances surrounding the October 22, 2004 sale — though the focus of the parties' arguments and of the trial court's analysis below-is not the critical inquiry in determining the reasonableness of the disposition of the collateral. This is because the collateral was not disposed of on October 22, 2004, since there were no bids above the minimum $2,000 price. The vehicle was ultimately disposed of by means of a private sale for the price of $4,995. (Dennis Affidavit, ¶ 33.) According to Exhibit 14 to the Dennis affidavit, the retail value of the vehicle was $4,350. Though price alone is not conclusively determinative of "commercial reasonableness,"[3] price is relevant to a consideration of reasonableness. U.C.C. § 9-610, Official Comment 10.
 {¶ 48} In this case, the price that CMI obtained met or exceeded the retail value of the vehicle. In our view, this is strong evidence that disposition of the collateral, achieved through a private sale, was commercially reasonable. Indeed, R.C. 1309.627(B)(2) provides that, "[a] disposition of collateral is made in a commercially reasonable manner if the disposition is made * * * [a]t the price current in any recognized market at the time of the disposition[.]" We find no contrary evidence in the record, with respect to the private *Page 22 
sale, that establishes the existence of a genuine issue of material fact on the issue of commercial reasonableness. For this reason, together with our analysis of the other issues raised by appellants' third claim for relief, we find no error in the trial court's grant of summary judgment to appellees with respect to that claim.
 {¶ 49} In their final argument in support of their first assignment of error, appellants contend that the trial court erred when it granted summary judgment in favor of appellees on appellants' first claim, in which they sought damages under the CSPA. Specifically, appellants alleged that CMI violated R.C. 4517.02(A)(6), which provides, in pertinent part:
 Except as otherwise provided in this section, no person shall do any of the following:
 * * *
 Make more than five casual sales of motor vehicles in a twelve-month period, commencing with the day of the month in which the first such sale is made, nor provide a location or space for the sale of motor vehicles at a flea market, without obtaining a license as a dealer under sections 4517.01 to 4517.45 of the Revised Code, provided that nothing in this section shall be construed to prohibit the disposition without a license of a motor vehicle originally acquired and held for purposes other than sale, rental, or lease to an employee, retiree, officer, or director of the person making the disposition, to a corporation affiliated with the person making the disposition, or to a person licensed under sections 4517.01 to 4517.45 of the Revised Code[.]
 {¶ 50} The trial court determined that the CSPA does not govern the transaction at issue. It concluded that because the CSPA only prohibits "an unfair or deceptive act or practice in connection with aconsumer transaction,"[4] and the term "consumer *Page 23 
transaction" under the CSPA does not include transactions involving a "dealer in intangibles" as defined in R.C. 5725.01(B)(1), the CSPA does not apply to this transaction because CMI is a "dealer in intangibles."
 {¶ 51} The trial court relied on the case of Haines v. Key OldsmobileCo. (Oct. 28, 1997), Franklin App. No. 97APE06-750, in which this court concluded that the plain language of R.C. 1345.01(A) exempts financial institutions from liability under the CSPA transactions because it explicitly excludes from the definition of "consumer transaction" any transaction between financial institutions and their customers.
 {¶ 52} On appeal, appellants assert that the trial court misappliedHaines and that Haines is distinguishable because in that case the transaction was a classic example of a bank lending money to a customer and did not involve the transfer of title to any goods between the bank and the customer. Here, however, appellants maintain, CMI stepped outside the safe haven of being a "dealer in intangibles" and engaged in the sale of goods, which meets the definition of "consumer transaction" in R.C. 1345.01(A) preceding the exemption for financial institutions, dealers in intangibles, and the like.
 {¶ 53} We reject this argument. The bank in Haines actually purchased the automobile in question from the dealership, and leased it to the plaintiff. The plaintiff attempted to persuade this court that, as such, the bank had stepped outside its role as a "financial institution" that merely lends money, and had engaged in the "lease of an item of goods" which would qualify as a "consumer transaction" under R.C. 1345.01(A) were it not for the exemption for financial institutions. But the court rejected that argument, *Page 24 
stating, "[t]here is no exception to the exemption on the basis of what that transaction is." We agree with the reasoning of the Haines court and affirm the trial court's determination herein that the CSPA does not apply to the transaction in the present case because R.C. 1345.01(A) provides a clear and unambiguous exemption for transactions involving dealers in intangibles and their customers.
 {¶ 54} Appellants argue, however, that the case of Brown v. LibertyClubs, Inc. (1989), 45 Ohio St.3d 191, 543 N.E.2d 783, compels the opposite conclusion. In that case, the defendant corporation solicited interest in lots of real estate located in a subdivision in Union County, Indiana, by mailing brochures to Ohio residents promising a "gift" in return for a visit to the subdivision. One such gift was a free set of steak knives. The plaintiffs visited the subdivision, received their "gifts" and purchased lots. Later, they sued Liberty Clubs, Inc. for breach of contract and sought rescission of their real estate contracts. They also pursued claims under the CSPA. All of the parties agreed that the CSPA does not ordinarily apply to real estate purchase contracts. However, the Supreme Court of Ohio concluded that Liberty Clubs, Inc., was subject to liability under the CSPA for its deceptive mail solicitations because the transfer of the steak knives was a separate "consumer transaction" under R.C. 1345.01(A).
 {¶ 55} Notably absent from the court's opinion, however, is any characterization of Liberty Clubs, Inc., as an entity that would otherwise enjoy immunity from the CSPA under one of the exemptions set forth in R.C. 1345.01(A), such as the exemption for financial institutions or that for dealers in intangibles. The court of appeals' opinion *Page 25 
likewise does not so specify, but it does mention that the direct mail solicitation invited the plaintiffs to Liberty Clubs, Inc.'s place of business to view the premises. We conclude from this that the defendant would not have qualified for such an exemption and was, most likely, the developer of the subdivision in question. Therefore, Liberty Clubs, Inc. stood in the same position relative to the plaintiffs in that case as would any non-exempt entity that transferred an item of goods to a customer. The real inquiry in which the Supreme Court of Ohio engaged, then, was whether the fact that the transfer of the steak knives was associated with a real estate transaction somehow exempted that transfer (not the transferor) from the provisions of the CSPA. The court elected not to apply a judicially created exemption to the steak knife transfer by virtue of the fact that it coincided with a real estate transaction. Ultimately, Liberty Clubs was about the nature of the transaction involved, not the nature of the parties involved.
 {¶ 56} In the present case, however, the plain language of the CSPA exempts one party involved — CMI, which is a "dealer in intangibles" — from the operation of the CSPA. The statute contains no exception to the dealer-in-intangibles exemption for situations where a dealer in intangibles sells a repossessed vehicle or other item of goods. If the General Assembly had intended to include such an exception in the statute, it could have done so. A prime example of the General Assembly providing language through which to impose liability upon an entity otherwise exempt from a consumer protection statute is the case ofGlouster Comm. Bank v. Winchell (1995), 103 Ohio App.3d 256,659 N.E.2d 330. *Page 26 
 {¶ 57} In that case, as discussed earlier herein, the entity that otherwise would have been exempt because it met the definition of a "financial institution" sufficient to take the transaction outside the definition of "consumer transaction" was nonetheless subject to RISA liability because the transaction met at least one of two other types of transactions that qualified the transaction as a "retail installment sale."
 {¶ 58} Here, the CSPA has no broader category within which "consumer transaction" falls, analogous to the "retail installment sale" category in RISA. Either the transaction at issue in this case was a "consumer transaction" or it was not. If it was, then the CSPA applies; if it was not, then the CSPA does not apply. By the plain language of R.C.1345.01(A), this was not a "consumer transaction" because it was a transaction between a dealer in intangibles and its customer. As the court in Haines explained, "[t]here is no exception to the exemption on the basis of what [the] transaction is." We decline to view the transfer of the Cadillac Concourse and the agreement for the loaning of money as two separate transactions in the way that the steak knife transfer and the real estate purchase agreement were treated separately inLiberty Clubs.
 {¶ 59} For all of the foregoing reasons, we conclude that the CSPA does not apply to the transaction at issue in this case and, therefore, the trial court correctly granted summary judgment in favor of appellees as to appellants' CSPA-based claims.[5] *Page 27 
In accordance with the foregoing discussion, appellants' first assignment of error is overruled.
 {¶ 60} We now move to a discussion of appellants' second assignment of error. Under this assignment of error, appellants present two arguments. First, they challenge the trial court's refusal to consider the affidavit of Frank Daniel ("Daniel"), an investigator retained by appellants' counsel. Appellants offered this affidavit in support of their argument that CMI was not entitled to summary judgment with respect to the issue of whether it disposed of the collateral in a commercially reasonable manner. Daniel's affidavit wholly concerns his observations of CMI's place of business at times when CMI had advertised that a public sale of automobiles would be taking place. He explains in detail that he did not observe any public sales occurring at the advertised times and that he was unable to locate any of the vehicles listed for sale on CMI's property. He also relates a conversation he had with King regarding whether public sales of vehicles occur on CMI's property.
 {¶ 61} The trial court refused to consider the Daniel affidavit because (1) appellants had failed to disclose Daniel as a witness, pursuant to Loc.R. 43; (2) in the court's opinion, appellants' counsel, through Daniel, had circumvented DR 7-104(A)(1), which prohibits an attorney from speaking with an adverse party known to be represented by counsel; (3) the court perceived Daniel's conversation with King as having been procured through deception; and (4) the court found Daniel's observations to be irrelevant *Page 28 
to the October 22, 2004 public sale of the Cadillac Concourse because Daniel observed CMI's place of business at least one year after that date.
 {¶ 62} We need not decide whether the trial court should have considered Daniel's affidavit because, as we previously noted, his observations are relevant only to the issues of whether disposition of the collateral was commercially reasonable. Because we have already determined that the disposition of the collateral — the private sale for the price of $4,995 — was reasonable pursuant to R.C. 1309.627(B)(2), because it resulted in a purchase price that exceeded the retail value of the vehicle, we need not determine the admissibility of evidence going to the issue whether the October 22, 2004 advertised public sale took place or whether it was conducted in a reasonable manner.
 {¶ 63} For their second argument in support of their second assignment of error, appellants contend that the trial court should have stricken a portion of Dennis' affidavit because, appellants argue, (1) that portion contradicts Dennis' deposition testimony, and (2) Dennis is biased due to his status as a defendant in this case.
 {¶ 64} The particular portion of the affidavit that appellants believe the trial court should have stricken is that in which Dennis states, "the only vehicles that CMI sells are those that CMI has repossessed as a result of a default in the terms of CMI's mortgage loans with its customers. CMI has not made more than five non-repossessed vehicles in any twelve-month period during at least the last six years." (Dennis Affidavit, ¶ 8.) However, these statements were relevant only to the substantive merits of appellants' CSPA-based claims. We have determined that the CSPA does not apply to the *Page 29 
transaction at issue here. As such, we are affirming the trial court's grant of summary judgment as to those claims without the need for discussion of the evidence going to the merits thereof. Accordingly, we need not pass upon whether the trial court should have considered the above-quoted statements.
 {¶ 65} For all of the foregoing reasons, appellants' second assignment of error is overruled.
 {¶ 66} Finally, in their third assignment of error, appellants argue that the trial court abused its discretion in granting appellees' motion for summary judgment without specifically ruling on appellants' then-pending motion for leave to file a second amended counterclaim to add new parties and new claims. Generally, when a trial court fails to rule on a motion, the appellate court will presume the trial court overruled the motion. Seff v. Davis, Franklin App. No. 03AP-159,2003-Ohio-7029, ¶ 16. Thus, we will presume that the trial court overruled appellants' motion for leave to amend.
 {¶ 67} In response to appellants' third assignment of error, appellees argue that their motion for summary judgment had been pending for seven weeks when appellants filed their motion for leave to amend their counterclaim, and that in the only case addressing the issue the First Appellate District held that it is not an abuse of discretion to rule upon an earlier filed motion for summary judgment before deciding a motion for leave to amend that was filed later. Lawyer's Co-OperativePublishing Co. v. Muething (Sept. 25, 1991), Hamilton App. No. C-900582, reversed on other grounds (1992), 65 Ohio St.3d 273, 603 N.E.2d 969. Appellees also point out that appellants filed their *Page 30 
motion after both witness-disclosure deadlines had passed, after CMI had engaged in a great deal of pretrial discovery and prepared its motion for summary judgment, and on the eve of the discovery cutoff date. Appellees maintain that, if the court had granted the motion for leave, this would have resulted in enormous prejudice to appellees because it would have required a continuance of the trial date and a costly second round of pretrial litigation. We agree.
 {¶ 68} Civ.R. 15(A) provides that a party may amend its pleading by leave of court and that such leave "shall be freely given when justice so requires." Turner v. Cent. Local School Dist. (1999),85 Ohio St.3d 95, 99, 706 N.E.2d 1261. While the rule allows for liberal amendment, motions should be refused if there is a showing of bad faith, undue delay, or undue prejudice to the opposing party. Id. The primary consideration is actual prejudice to the opposing party because of the delay. Schweizer v. Riverside Methodist Hospitals (1996),108 Ohio App.3d 539, 546, 671 N.E.2d 312.
 {¶ 69} A trial court's decision to grant or deny a motion for leave to amend a pleading is discretionary and will not be reversed absent an abuse of discretion. State ex rel. Askew v. Goldhart (1996),75 Ohio St.3d 608, 610, 665 N.E.2d 200. An abuse of discretion connotes a decision that is unreasonable, arbitrary, or unconscionable. Id.
 {¶ 70} In this case, appellants sought to add new parties and claims when the dispute between the parties had been litigated in one court or another for 15 months, and after they had engaged in a great deal of pretrial discovery, which likely would have had to be duplicated upon the entrance of new parties. Moreover, nearly all of the deadlines *Page 31 
in the Clerk's Original Case Schedule had passed and the case was approaching its scheduled trial date. We also note that appellees' motion for summary judgment had been pending for seven weeks by the time appellants sought to amend their counterclaim. While Civ.R. 15(A) allows for liberal amendment, motions should be refused if there is a showing of bad faith, undue delay, or undue prejudice to the opposing party.Turner, supra. With this in mind, we perceive no arbitrariness or unreasonableness in the trial court's failure to rule on appellants' motion for leave to amend their counterclaim. Accordingly, appellants' third assignment of error is overruled.
 {¶ 71} In summary, appellants' first, second, third and fourth assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
 {¶ 72} Judgment affirmed.
 {¶ 73}
 {¶ 74} BROWN, J., concurs.
 {¶ 75} WHITESIDE, J., dissents.
 {¶ 76}
 {¶ 77} WHITESIDE, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
 {¶ 78}
 {¶ 79}
[1] Accord, BancOhio Nat'l Bank v. Quito (June 22, 1990), Ross App. No. 1527. See, also, Bank One Dayton, N.A. v. Doughman (1988),59 Ohio App.3d 60, 64, 571 N.E.2d 442 ("when we read R.C. 1317.01(Q), 1317.031
and 1317.032 together, we conclude that the General Assembly intended to continue the distinction between an installment contract made with the retail seller and an installment note made with a financial institution, and not to make the installment note subject to the entirety of the provisions of R.C. Chapter 1317. We conclude that the legislature did not intend to merge an installment note into an installment sale if executed in connection with a consumer transaction."). See, also,Huntington Bank v. Elkins (1987), 43 Ohio App.3d 64, 67-68,539 N.E.2d 1135.
[2] The trial court went on to discuss the fact that the Ohio Mortgage Loan Act ("MLA") permits lenders who register under the MLA to charge a loan origination fee in addition to the maximum 25 percent interest allowable under RISA. As appellants correctly observed in their merit brief, it is irrelevant that CMI is a MLA registrant; the question is whether CMI is subject to the usury provision of RISA and whether CMI violated it. Having fully determined these two issues, and having concluded that CMI did not violate RISA, we find it unnecessary to review the trial court's findings with respect to the MLA.
[3] Elkins, supra.
[4] R.C. 1345.02(A). (Emphasis added.)
[5] The trial court went on to determine that, even if the CSPA did apply, CMI had not violated any of its provisions. The parties have argued this issue on appeal; however, because we have concluded that the CSPA has no application herein, we need not discuss that determination of the trial court.