FORD MOTOR CREDIT COMPANY et al., Appellees,

v.

RYAN et al., Defendants.

[Cite as *Ford Motor Credit Co. v. Ryan*, 189 Ohio App.3d 560, 2010-Ohio-4601.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 09AP–501, 09AP–555, 09AP–263, and 10AP–274.

Decided Sept. 28, 2010.

564

568

Frantz Ward L.L.P., Brett K. Bacon, and Timothy J. Richards, for appellee Ford Motor Credit Company.

Reminger & Reminger Co., L.P.A., and Michael J. Valentine, for appellee Automobile Recovery Service of Cincinnati, Inc.

Stockamp & Brown, L.L.C., David A. Brown, Deanna L. Stockamp, and Stephen D. Brown, for appellee Bob–Boyd Lincoln Mercury, Inc.

Carolyn P. Ryan, pro se.

James M. Ryan, pro se.

———————

KLATT, Judge.

{¶ 1} Defendant-appellant, James M. Ryan, and third party defendant-appellant, Carolyn P. Ryan, appeal multiple decisions of the Franklin County Court of Common Pleas. For the following reasons, we affirm in part and reverse in part.

{¶ 2} On August 10, 2005, plaintiff-appellee, Ford Motor Credit Company ("Ford"), brought a breach-of-contract action against James and Ryan and Ryan, Inc. ("RRI"), in the Franklin County Municipal Court. Ford alleged that James and RRI had failed to pay amounts due under a motor-vehicle lease agreement that James and RRI had entered into when they coleased a 2002 Ford Windstar. James and RRI answered the complaint, and James filed a counterclaim. Because the damages sought in the counterclaim exceeded the municipal court's monetary jurisdiction, the municipal court transferred the case to the common pleas court.

{¶ 3} In the common pleas court, Ford sought and received leave to file an amended complaint and a third-party complaint. In the amended complaint, Ford asserted three more breach-of-contract claims against James and RRI. These claims alleged that James and RRI had failed to pay amounts due under (1) a retail installment contract that James and Ryan and Ryan Real Estate Company ("R & R")[1] had entered into when copurchasing a 2004 Mercury Monterey, (2) a retail installment contract that James and R & R had entered into when copurchasing a 2004 Mercury Mountaineer, and (3) a retail installment contract that James and R & R had entered into when copurchasing a 2004 Mercury Mountaineer Premier.[2]

{¶ 4} In its third-party complaint, Ford asserted a breach-of-contract claim against James's wife, Carolyn. Ford alleged that Carolyn had failed to pay

———————

1. At this stage in the proceedings, Ford did not appreciate that RRI and R & R are two different corporations. Although Ford later sought to add R & R as a defendant, it never achieved service on R & R. Accordingly, R & R is not a party to this action.

2. Ford also brought a counterclaim against RRI solely for breach of a retail installment contract for the purchase of a 2004 Mercury Grand Marquis that R & R had copurchased with Thomas J. Ryan, James and Carolyn's son.

amounts due under a retail installment contract that she had entered into when she purchased a 2004 Mercury Grand Marquis.[3]

{¶ 5} At the time that Ford filed its amended complaint and third-party complaint, it had already repossessed the vehicles at issue in those pleadings. Ford had hired Automobile Recovery Services of Cincinnati, Inc. ("ARS"), to accomplish each of the repossessions. Ford and ARS had a contractual arrangement whereby ARS provided Ford with repossession services. In the contract, ARS agreed to (1) forgo any repossession that would involve a breach of peace and (2) indemnify Ford for all expenses incurred in connection with legal claims that related to ARS's performance of its contractual obligations.

{¶ 6} ARS repossessed four of the Ryans' vehicles without incident. However, during the repossession of the Premier, James and the ARS agent engaged in a verbal and physical altercation. James's counterclaim had asserted multiple tort claims against Ford based on the actions of ARS's agent. Therefore, in addition to naming Carolyn, Ford's third-party complaint also named ARS as a third-party defendant. Ford alleged breach-of-contract and indemnity claims against ARS.

{¶ 7} In response to Ford's amended and third-party complaints, James and Carolyn each filed an answer and counterclaim.[4] James and Carolyn asserted claims against Ford for (1) conversion, (2) trespass, (3) assault, (4) breach of peace, (5) intentional infliction of emotional distress, (6) invasion of privacy, (7) violation of Section 1983, Title 42, U.S.Code ("Section 1983"), (8) breach of contract, (9) violation of the Fair Debt Collection Practices Act, Section 1692, Title 15, U.S.Code ("FDCPA"), (10) violation of the Ohio Consumer Sales Practices Act, R.C. 1345.01 et seq. ("CSPA"), and (11) violation of the Ohio Retail Installment Sales Act, R.C. 1317.01 et seq. ("RISA"). James alone also asserted a claim for negligence against Ford.

{¶ 8} Both James and Carolyn brought a cross-claim against ARS. The cross-claims stated claims for (1) conversion, (2) trespass, (3) assault, (4) breach of peace, (5) intentional infliction of emotional distress, (6) invasion of privacy, (7) violation of Section 1983, (8) violation of the FDCPA, and (9) violation of the RISA.

{¶ 9} Additionally, both James and Carolyn named Bob–Boyd Lincoln Mercury, Inc. ("Bob–Boyd") as a third-party defendant. The Ryans had leased or

---

**3.** Ford also brought a third-party complaint against Thomas J. Ryan alleging that he had failed to pay as he had agreed in the retail installment contract that he entered into when copurchasing the Grand Marquis with R & R.

**4.** RRI also filed a counterclaim against Ford. This counterclaim remains pending before the trial court.

purchased each of the vehicles at issue in the instant case from Bob–Boyd. James and Carolyn asserted claims against Bob–Boyd for (1) breach of contract, (2) violation of the CSPA, and (3) estoppel.

{¶ 10} Ford, ARS, and Bob–Boyd moved for summary judgment on all the claims that James and Carolyn had asserted against them. Ford also moved for summary judgment as to its breach-of-contract claim against Carolyn, as well as its four breach-of-contract claims against both James and RRI. In three different judgment entries, the trial court granted all the summary-judgment motions. James and Carolyn separately appealed the three judgments to this court.

{¶ 11} On appeal, James and Carolyn point out that the trial court's grant of summary judgment had not resolved all the claims pending before the court. Despite the existence of unresolved claims, two of the judgments—those granting Ford's and Bob–Boyd's summary-judgment motions—did not contain Civ.R. 54(B) language. James and Carolyn argued that absent Civ.R. 54(B) language, those two judgments did not constitute final, appealable orders.

{¶ 12} This court stayed the two appeals and remanded the matter to the trial court so that it could address the remaining claims. The trial court responded by again entering judgment in Ford and Bob–Boyd's favor on their summary-judgment motions, but this time, including Civ.R. 54(B) language in the judgment entries. Both James and Carolyn then filed additional appeals from the amended judgment entries. We have consolidated all the appeals.

{¶ 13} In their first appeals (designated as case Nos. 09AP–501 and 09AP–555), James and Carolyn assign the following errors: [5]

[1] The Trial Court Erred in terminating the case for the reason that the Trial Courts Journal Entries do not delineate the parties responsibilities and/or their obligations and further that the Trial Courts Orders do not meet the requirements of Section 2505.02 Ohio Revised Code and Civ. Rule 54( B) with the exception of the judgment Entry Granting Third Party Defendant Automobile Recovery Services of Cincinnati Inc. Motion for Summary Judgment, dated May 15, 2009.

[2] The Trial Court erred as a matter of law and fact in granting summary judgment to ARS and by dismissing Defendant/Plaintiff's claims for trespass, breach of peace, conversion, assault, seizure, invasion of privacy, violation of 42 U.S.C. 1983, violation of the Fair Debt Collection Act, violation of the Ohio Retail Installment Act, and the Ohio Consumer Sales Practices Act, by the Court finding that Ohio Law grants authority to independent contractors such as ARS the authority to enter private property against the objections of its

---

5. We quote all the assignments of error verbatim, without correcting the grammatical, spelling, punctuation, or citation errors.

owners and to remove property from the cartilage of the home to the public street for the purpose of repossession. These actions taken by ARS and the finding of the Trial Courts Order permitting such actions violates Defendant/Plaintiff's rights under existing Ohio Law, the Ohio Constitution and the United States Constitution and contrary to the Trial Courts findings there are genuine issues of material fact in the record as set forth herein that are genuinely disputed that should be set for trial. ARS is not entitled to Summary Judgment as a matter of law and viewing the evidence in the light most favorable to the non moving party, reasonable minds could not come to one conclusion adverse to the party against whom the motion is made. Fuentes v Shevin 407 U.S. 67, [92 S.Ct. 1983, 32 L.Ed.2d 556], Sodal v Cook County ILL. 506 U.S. 56, [113 S.Ct. 538, 121 L.Ed.2d 450] Lungar [Lugar] v Edmondson Oil Co. 457 U.S. 922[, 102 S.Ct. 2744, 73 L.Ed.2d 482]. The Trial Court lacked jurisdiction over ARS for those actions that are under the exclusive jurisdiction of the Public Utilities Commission. Olympic Holding Co. L.L.C. v. Ace [ACE] Ltd. 122 Ohio St.3d 89[, 2009-Ohio-2057, 909 N.E.2d 93].

[3] The Trial Court erred as a matter of law and fact in granting Summary Judgment to ARS by finding that Defendant Ryan did not have any evidence of outrageous or extreme conduct and that Defendants did not have any evidence of extreme emotional distress and did not have any form of expert testimony and that Appellant was not entitled to punitive damages.

[4] The Trial Court erred in failing to dismiss Ford Motor Credit Company's September 19, 2006 Amended Complaint and by granting Summary Judgment to Ford Motor Credit Company on Counts I and III–V of the Amended Complaint for the reason that the Amended Complaint fails to state a claim upon which relief can be granted, for the reason that the amended Complaint did seek and receive a declaratory judgment that all Defendants be jointly and severally liable for sums claimed due for which defendants are not contractually obligated to be, for the reason that FMCC has failed to join and commence an action against an indispensable party, Ryan and Ryan real Estate Co. without which party complete relief cannot be accorder Defendant and such failure to name a indispensable necessary party is a jurisdictional defect that precludes judgment and renders any declaration by the Trial Court Void, and for the reason that the Amended Complaint fails to claim default by the buyers in their contractual obligations all of which are genuine issues of material facts that are in dispute which precludes a judgment in this matter.

[5] The Trial Court erred in Granting Summary judgment in favor of FMCC and Bob Boyd in its findings that the evidence conclusively demonstrates the vehicles were purchased primarily for business purposes and that the Consumer Sales Protection Act does not apply.

{¶ 14} James alone (in case No. 09AP–501) assigns the final error:

[6]  The Trial Court erred by granting Ford Motor Credit Company's Emergency Motion for an Order Exercising Jurisdiction Over and Denying Return of Mercury Mountaineer.  Judge Lynch's Order violates the Fourth, Fifth, and Fourteenth Amendment of the U.S. Constitution. The Order seizes the Premier denying a "substantial right" of possession and use to Appellant, denies Appellant's rights to due process of a post deprivation hearing and legitimizes the illegal actions of trespass, wrongful removal and conversion of property by combination of FMCC & ARS.

{¶ 15} In his second appeal (designated as case No. 10AP–263), James assigns the following errors:

[1]  The Trial Court erred in Granting its Amended Entry Granting Summary Judgment In Favor Of Bob–Boyd Lincoln Mercury Inc. dated February 24, 2010.

[2]  The Trial Court Erred in dismissing Defendants/Third Party claims against Automobile Recovery Services Of Cincinnati Inc.

[3]  The Trial Court erred in granting Automobile Recovery Services of Cincinnati Inc's Motion for Summary Judgment, as agent of Ford Motor Credit Company and as well as on its own behalf, the issue of assaulting James M. Ryan, creating a breach of the peace, wrongful conversion and/or stealing a 2004 Mercury Mountaineer "Premier" from the car port curtilage of the James and Carolyn Ryan residence at 3165 Dale Avenue Columbus Ohio 43209 on January 12, 2006 eliminated any right of entry on to the Ryan's private property that may have existed under of color of state law as set forth in James M. Ryan's counterclaim to Plaintiff's Amended Complaint, crossclaim, and third party complaint against third party defendant Automobile Recovery Services of Cincinnati Inc this entry onto private property and the removal of the vehicle was therefore an illegal act.  The Trial Court erred in dismissing Defendants/Third party Counterclaims.

[4]  Sections 1309.609(A)(1) & (2) & Section 1390.609(B)(2) Ohio Revised Code are unconstitutional as they violate the Due Process right Defendant James M. Ryan, a citizen of the State of Ohio, they violate Article I Section 1.01, 1.16 and 1.19 of the Ohio Constitution, they violate the Fourth and Fourteenth Amendment of the United States Constitution.

[5]  The Trial Court Erred in denying appellant's motion for continuance pursuant to Civil Rule 56(F).

[6]  The Trial Court erred by granting Ford Motor Credit Company's Emergency Motion for an Order Exercising Jurisdiction Over and Denying Return of Mercury Mountaineer. Judge Lynch's Order violates the Fourth, Fifth and Fourteen[th Amendment of the United States Constitution and Article 1.16 & 1.19 of the Ohio Constitution.  The Order seizes the vehicle

known as the Premier denying a "substantial Right" of possession and use to Appellant, denies Appellant's rights to due process, of a post deprivation hearing and legitimizes the illegal actions of trespass, wrongful removal and conversion of property by both Ford Motor Credit Company and Automobile Recovery Services of Cincinnati Inc.

[7] The Trial Court Erred in issuing its Amended Judgment Entry dated February 25, 2010 by granting plaintiff Ford Motor Credit Company's Motion for Summary Judgment and dismissing with prejudice the claims in their entirety, and by entering judgment against James M. Ryan in the amount of $2,742.65, by granting judgment against James M. Ryan in the amounts of $1,612.37, $1,740.89 and $4,392.20 as James M. Ryan was not in default of his Contracts and any sums that may be due under the Contracts are subject to off set and that the Motions do not meet the requirements of Civil Rule 56(C).

[8] The Trial Court Erred in its Decision and Entry Granting Plaintiff's Motion For an Order Granting it Leave to Sell Collateral Filed September 19, 2006.

{¶ 16} Carolyn's assignments of error are identical,[6] except she omits the fourth and sixth assignments of error and substitutes the following in place of James's seventh assignment of error:

The Trial Court Erred in issuing its Amended Judgment Entry dated February 25, 2010 by granting plaintiff Ford Motor Credit Company's Motion for Summary Judgment and dismissing with prejudice the claims in their entirety, and by entering judgment in the amount of $8,635.24 as Carolyn P. Ryan was not in default of her Contract, that the motions do not meet the requirements of Civil Rule 56(C).

■ {¶ 17} Before considering the merits of appellants' assignments of error, we must address ARS's motion to strike. In its motion, ARS requests that this court strike from the second appeals the assignments of error and arguments related to it. ARS points out that the judgment entry granting it summary judgment included Civ.R. 54(B) language, making it a final, appealable order. Appellants appealed that judgment in case Nos. 09AP–501 and 09AP–555, and they both filed briefs in support of their appeals. ARS contends that once the briefing in case Nos. 09AP–501 and 09AP–555 concluded, appellants could not, without leave of court, submit additional assignments of error and argument directed toward ARS. We agree.

{¶ 18} The trial court's rulings on Ford and Bob–Boyd's summary-judgment motions did not become final, appealable orders until the trial court issued the

---

6. Carolyn's second appeal is designated appeal No. 10AP–274.

amended judgment entries. Thus, in their second appeals, appellants could, and did, assign and argue error arising from those amended judgments. However, because the judgment granting ARS summary judgment was a final, appealable order, appellants' appeals from that judgment presented their only opportunity to assign and argue error as to that judgment.

{¶ 19} Moreover, the appeal from the judgment granting ARS summary judgment gave appellants their only chance to appeal those interlocutory orders related to that judgment. When a final judgment does not terminate the entire case, but only terminates the case as to certain claims or parties, only prior interlocutory orders that relate to the final judgment will merge into the final judgment. *Davis v. Galla*, 6th Dist. No. L–08–1149, 2008-Ohio-3501, 2008 WL 2700008, ¶ 5–6. See also *Haley v. Reisinger*, 9th Dist. No. 24376, 2009-Ohio-447, 2009 WL 250871, ¶ 11–12; *Norcold, Inc. v. Gateway Supply Co.*, 3d Dist. No. 17–05–11, 2006-Ohio-6919, 2006 WL 3802609, ¶ 25–36 (an interlocutory order unrelated to the final judgment that terminated the case as to one party did not become appealable until the final disposition of the case). Thus:

> For example, if a trial court judge makes an interlocutory ruling that certain documents will not be considered in making its decision on a summary judgment motion and subsequently, finding that there is no just reason for delay, the judge grants the summary judgment motion as to one of the defendants, then an appeal from the grant of summary judgment may include an appeal from the interlocutory ruling concerning the consideration of documents. The "documents ruling" will merge into the final order granting summary judgment.

*Davis* at ¶ 6.

{¶ 20} In the case at bar, prior to ruling on ARS's motion for summary judgment, the trial court denied appellants' Civ.R. 56(F) motion for a continuance to respond to ARS's motion. The judgment denying the Civ.R. 56(F) motion was an interlocutory order related to the judgment granting ARS summary judgment. Consequently, the judgment denying the Civ.R. 56(F) motion merged into the final judgment disposing of the claims brought against ARS. Appellants, therefore, had to assert and argue any errors arising from the denial of the Civ.R. 56(F) motion in their first set of appeals.

{¶ 21} App.R. 16 allows an appellant to file an initial brief and a reply brief, and an appellee to file a response brief. "No further briefs may be filed except with leave of court." App.R. 16(C). Here, appellants did not seek leave to file additional briefing as to ARS. Accordingly, we strike the second and third assignments of error from case Nos. 10AP–263 and 10AP–274. To the extent that they relate to ARS, we also strike the fifth assignment of error from case No. 10AP–263 and the fourth assignment of error from case No. 10AP–274.

{¶ 22} We will address case Nos. 09AP–501 and 09AP–555 first. By the first assignments of error in those appeals, appellants argue that the trial court did not render final, appealable orders when it ruled on Ford and Bob–Boyd's summary-judgment motions. These assignments of error became moot once the trial court issued the amended judgment entries. Accordingly, we need not decide appellants' first assignments of error.

{¶ 23} By appellants' second assignments of error, they argue that the trial court erred in granting ARS summary judgment on all their claims against it. Although these assignments of error challenge the trial court's ruling on appellants' claims for invasion of privacy, seizure, and violation of the FDCA, RISA, and CSPA, appellants do not advance any argument in support this challenge. Likewise, the assignments of error contest the trial court's jurisdiction over ARS, but appellants fail to assert an argument on this point. An appellant must demonstrate each assigned error through an argument supported by citations to legal authority and facts in the record. App.R. 16(A)(7); *Cross v. Ohio Adult Parole Auth. Chief,* 10th Dist. No. 09AP–364, 2009-Ohio-5027, 2009 WL 3065176, ¶ 3. If an appellant neglects to advance such an argument, a court of appeals may disregard the assignment of error. App.R. 12(A)(2); *Bond v. Canal Winchester,* 10th Dist. No. 07AP–556, 2008-Ohio-945, 2008 WL 600201, ¶ 16–17. Accordingly, we will disregard those portions of the second assignments of error that appellants fail to separately argue.

{¶ 24} We now turn to the merits of appellants' argument that their claims against ARS for trespass, conversion, assault, and violation of Section 1983 should have survived summary judgment.[7] Appellate review of summary-judgment motions is de novo. *Andersen v. Highland House Co.* (2001), 93 Ohio St.3d 547, 548, 757 N.E.2d 329. " 'When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court.' " *Abrams v. Worthington,* 169 Ohio App.3d 94, 2006-Ohio-5516, 861 N.E.2d 920, ¶ 11, quoting *Mergenthal v. Star Banc Corp.* (1997), 122 Ohio App.3d 100, 103, 701 N.E.2d 383. Civ.R. 56(C) provides that a trial court must grant summary judgment when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion

---

7. In making this argument, James presumes that he can pursue claims arising from the repossession of the Mercury Grand Marquis copurchased by Thomas J. Ryan and R & R. Because James neither purchased nor had any personal ownership interest in the Grand Marquis, he cannot assert any claims related to it. Thus, we do not address the Grand Marquis in our consideration of James's arguments.

for summary judgment is made. *Gilbert v. Summit Cty.*, 104 Ohio St.3d 660, 2004-Ohio-7108, 821 N.E.2d 564, ¶ 6.

{¶ 25} When seeking summary judgment on the ground that the nonmoving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the nonmoving party's claims. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. The moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the nonmoving party has no evidence to prove its case. Id. Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the nonmoving party has no evidence to support its claims. Id. If the moving party meets this initial burden, then the nonmoving party has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. Id.

{¶ 26} Initially, we note that although ARS sought summary judgment on all appellants' claims, it failed to explain in its motion why the trial court should grant summary judgment on appellants' trespass claims. In fact, the motion does not mention the trespass claims at all, other than listing "trespass" in its recitation of all the claims appellants asserted.[8] Likewise, ARS's brief on appeal contains no argument regarding appellants' trespass claims. Because ARS neither established the absence of a genuine issue of material fact regarding the trespass claims nor presented a legal reason why those claims must fail, we conclude that the trial court erred in granting summary judgment to ARS on appellants' trespass claims.

{¶ 27} Appellants next contend that the existence of genuine issues of material fact precluded summary judgment on their conversion claims. " '[C]onversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights.' " *State ex rel. Toma v. Corrigan* (2001), 92 Ohio St.3d 589, 592, 752 N.E.2d 281, quoting *Joyce v. Gen. Motors Corp.* (1990), 49 Ohio St.3d 93, 96, 551 N.E.2d 172. ARS argues that it did not wrongfully take appellants' vehicles because Ford had a contractual right to repossess the vehicles, and Ford hired ARS to exercise its contractual right. Section G of the

---

8. ARS apparently recognized this deficiency, acknowledging in its reply brief that it "did not address [the trespass claims] within its Motion." Nevertheless, ARS still claimed that it was entitled to summary judgment on all appellants' claims.

retail installment contracts states that if the obligor(s) default, Ford "may repossess (take back) the vehicle." In Ohio, this right to repossession is subject to R.C. 1309.609, which provides:

(A) After default, a secured party:

(1) May take possession of the collateral * * *.

(B) A secured party may act under division (A) of this section:

(1) Pursuant to judicial process; or

(2) Without judicial process if it acts without breach of the peace.

{¶ 28} R.C. 1309.609 is virtually identical to Section 9–609 of the Uniform Commercial Code ("U.C.C."). The General Assembly incorporated U.C.C. provisions into the Ohio Revised Code "[t]o make uniform the laws among the various jurisdictions." R.C. 1301.02(B)(3). Accordingly, to supplement Ohio law, our analysis of R.C. 1309.609 relies upon precedent from other jurisdictions addressing U.C.C. 9–609 and similar state statutes. Additionally, this court looks to caselaw interpreting former R.C. 1309.46, which preceded R.C. 1309.609 and duplicated former U.C.C. 9–503.[9] 149 Ohio Laws, Part I, 106, 107–108. Like U.C.C. 9–609, former U.C.C. 9–503 also allowed the repossession of collateral upon default if the creditor accomplished the repossession without a breach of the peace. Consequently, precedent from other jurisdictions interpreting former U.C.C. 9–503 and like state statutes also inform our analysis.

{¶ 29} R.C. 1309.609 gives a secured party the right to attempt self-help repossession if a debtor defaults. *State v. LeFevre* (May 4, 1995), 10th Dist. No. 94APA09–1376, 1995 WL 258959; *Smith v. John Deere Co.* (1993), 83 Ohio App.3d 398, 408, 614 N.E.2d 1148. However, "[i]f the secured party, or a third party repossessing for the secured party, causes a breach of peace while repossessing the collateral, the repossession will be wrongful, and the debtor may sue the secured party in conversion for return of the collateral or damages." 9 Hawkland, Uniform Commercial Code Series (2001), Section 9–503:3. See also *Bear v. Colonial Fin. Co.* (1932), 42 Ohio App. 482, 487–489, 182 N.E. 521 (a secured party who breaches the peace in repossessing collateral may be liable for conversion under Ohio common law); *Clark v. Assocs. Commercial Corp.* (D.Kan. 1994), 877 F.Supp. 1439, 1450, fn. 9, quoting 68A American Jurisprudence 2d, Secured Transactions, Section 622 (" 'Generally, when the creditor, by self-help, repossesses the collateral by a breach of peace, the creditor is liable for trespass and conversion' "); *Ivy v. Gen. Motors Acceptance Corp.* (Miss.1992), 612 So.2d

---

9. Former R.C. 1309.46 read, "Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace." 129 Ohio Laws, 13, 168. Former R.C. 1309.46 is identical to former U.C.C. 9–503.

1108, 1117 (a debtor may sue in conversion if the secured party breaches the peace in repossessing the collateral); *MBank El Paso, N.A. v. Sanchez* (Tex. 1992), 836 S.W.2d 151, 152 (when a breach of peace occurs, "the secured party may be held liable in tort"); *Gen. Elec. Credit Corp. v. Timbrook* (1982), 170 W.Va. 143, 145, 291 S.E.2d 383 ("And, of course, if repossessions result in breaches of the peace, creditors are responsible for any torts they commit"); *Northside Motors of Florida, Inc. v. Brinkley* (Fla.1973), 282 So.2d 617, 624 (self-help repossession methods that breach the peace "would expose the creditor to tort liability"); *McCall v. Owens* (Tenn.App.1991), 820 S.W.2d 748, 752 ("When the repossessor uses force and breaches the peace, the repossessor may be liable for trespass, conversion, assault and battery and other torts"); 2 Anderson, Uniform Commercial Code (3d Ed.) 925, Section 9–609:7 ("Being unauthorized to repossess the collateral because of the breach of the peace, the secured party will be liable to the debtor in conversion for having wrongfully interfered with the debtor's possession of the collateral").

{¶ 30} Normally, a conversion occurs if a person takes another's vehicle without the owner's permission. See *Toma*, 92 Ohio St.3d at 592, 752 N.E.2d 281. R.C. 1309.609 provides a defense to such a conversion claim because it permits a repossessor to take possession of the vehicle, rendering the repossession lawful. This defense, however, depends on the absence of a breach of the peace. If a breach of the peace occurs, the repossessor cannot rely on R.C. 1309.609 to excuse its actions. *Marcus v. McCollum* (C.A.10, 2004), 394 F.3d 813, 820 ("If a breach of peace occurs, self-help repossession is statutorily precluded"). At the point the peace is breached, the repossessor's exercise of dominion over the vehicle becomes wrongful, exposing the repossessor to liability for conversion.

{¶ 31} A breach of peace is:

[A] violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence or tending to provoke or excite others to break the peace, or, as is some times said, it includes any violation of any law enacted to preserve peace and good order. It may consist of an act of violence or an act likely to produce violence.

*Morris v. First Natl. Bank & Trust Co.* (1970), 21 Ohio St.2d 25, 29, 50 O.O.2d 47, 254 N.E.2d 683, quoting *Akron v. Mingo* (1959), 169 Ohio St. 511, 513, 9 O.O.2d 7, 160 N.E.2d 225. A breach of peace includes " 'all violations of public peace, order or decorum' " and " 'breaking or disturbing the public peace by any riotous, forceful or unlawful proceedings.' " *Makepeace v. Chrysler Motors Corp.* (May 8, 1981), 2d Dist. No. L–80–187, 1981 WL 5572, quoting *Census Fed. Credit Union v. Wann* (Ind.App.1980), 403 N.E.2d 348.

{¶ 32} In the case at bar, ARS repossessed three vehicles copurchased by James and R & R, as well as Carolyn's vehicle. Three of the repossessions

proceeded uneventfully. On February 7, 2006, ARS towed the Mountaineer from the parking lot of R & R's office building. Although James "saw it go away," he "didn't have any time to respond." ARS took the Monterey that James copurchased from his son's driveway sometime during the night of February 7 and 8, 2006. That same night, ARS took Carolyn's vehicle from the carport of the Ryans' home. Neither James, his wife, nor his son knew that the repossessions had occurred until they awoke the next morning.

{¶ 33} Appellants acknowledge that the ARS agents did not threaten, incite, or commit any act of violence when they repossessed the three vehicles on February 7 and 8, 2006. Appellants, however, argue that the ARS agents breached the peace when they entered onto private property to repossess the vehicles.

{¶ 34} Generally, no breach of peace occurs merely because the repossessor enters on a person's driveway or carport to retrieve a vehicle. *Geeslin v. Nissan Motor Acceptance Corp.* (June 3, 1998), N.D.Miss. No. Civ. A. 1:97CV186–DA, 1998 WL 433932, affirmed (C.A.5, 2000), 228 F.3d 408 (table). See also *Butler v. Ford Motor Credit Co.* (C.A.5, 1987), 829 F.2d 568, 570 (holding that the removal of a vehicle from a private driveway in the early morning hours while the debtor was asleep did not constitute a breach of peace); *Oaklawn Bank v. Baldwin* (1986), 289 Ark. 79, 81, 709 S.W.2d 91 (same); *Giles v. First Virginia Credit Servs., Inc.* (2002), 149 N.C.App. 89, 102, 560 S.E.2d 557 (same); *Ragde v. Peoples Bank* (1989), 53 Wash.App. 173, 176–77, 767 P.2d 949 (same). " '[I]n general, a mere trespass, standing alone, does not automatically constitute a breach of the peace.' " *Pantoja–Cahue v. Ford Motor Credit Co.* (2007), 375 Ill.App.3d 49, 55, 313 Ill.Dec. 650, 872 N.E.2d 1039, quoting *Chrysler Credit Corp. v. Koontz* (1996), 277 Ill.App.3d 1078, 1083, 214 Ill.Dec. 726, 661 N.E.2d 1171. See also *Ivy*, 612 So.2d at 1111 ("[E]ntering a private driveway to repossess collateral without use of force does not constitute a breach of peace"); 2 Anderson, Uniform Commercial Code (3d Ed.) 924, Section 9–609:6 ("[T]aking property from a driveway or other open area, even though technically trespassing, will not generally, by itself, make the repossession involve a breach of the peace").

{¶ 35} Indeed, R.C. 1309.609 gives a repossessor a privilege to enter another's land to effectuate a repossession, so long as the repossessor does not breach the peace. *LeFevre* (because former R.C. 1309.46 gave the secured party the right to take possession of the collateral upon default, the repossessor "had the right to enter [the debtor's] property to repossess the car upon his default if such could be done without a breach of the peace"). See also *Callaway v. Whittenton* (Ala.2003), 892 So.2d 852, 858 (the Alabama repossession statute based on U.C.C. 9–609 "gives a secured creditor the right to enter a debtor's land for the purpose of repossession"); *Pantoja–Cahue*, 375 Ill.App.3d at 56, 313 Ill.Dec. 650, 872

N.E.2d 1039, quoting *Koontz*, 277 Ill.App.3d at 1084, 214 Ill.Dec. 726, 661 N.E.2d 1171 (the secured creditor enjoyed a "limited privilege" to enter the debtor's property " 'for the sole and exclusive purpose of effectuating the repossession' "); *Thompson v. First State Bank of Fertile* (Minn.App.2006), 709 N.W.2d 307, 312 ("a secured party's authority to take possession of collateral after default carries with it the privilege to enter another's land for the purpose of taking possession of the collateral if the entry is reasonably necessary in order to take possession"); *Sperry v. ITT Commercial Fin. Corp.* (Mo.App.1990), 799 S.W.2d 871, 876–877 (the secured party "had an absolute legal privilege to enter [the debtor's] property to peacefully repossess all collateral in the event of default"); *Marine Midland Bank–Cent. v. Cote* (Fla.App.1977), 351 So.2d 750, 752 (the right to self-help repossession in Florida's version of former U.C.C. 9–503 implied "a limited privilege to enter on the debtor's land"); Restatement of the Law 2d, Torts (1965), Entry Pursuant to Legislative Duty or Authority, Section 211 ("A duty or authority imposed or created by legislative enactment carries with it the privilege to enter land in the possession of another for the purpose of performing or exercising such duty or authority in so far as the entry is reasonably necessary to such performance or exercise, if, but only if, all the requirements of the enactment are fulfilled"); Carter, Repossessions (6th Ed.2005) 205, Section 6.4.4.2 ("When there is a limited entry onto the debtor's property, such as the debtor's driveway, carport, or open garage, the creditor is said to have an implied limited privilege peacefully to trespass and take possession of the collateral, as long as the debtor does not object and no breach of the peace is committed while on the land").

{¶ 36} Here, ARS exercised its right under R.C. 1309.609 to enter onto private property to repossess the three vehicles on February 7 and 8, 2006. This trespass, without more, does not constitute a breach of peace. Accordingly, no liability for conversion arose out of the repossessions of the three vehicles.

{¶ 37} Appellants, however, argue that ARS did not have the right to enter onto their property because R.C. 1309.609 extends that authority only to the "secured party." Because ARS is not the "secured party," appellants contend that it cannot rely on R.C. 1309.609. We find this argument unavailing. Just because R.C. 1309.609 confers the right of repossession on the "secured party" does not mean that the secured party must personally repossess the collateral. 10 Anderson, Uniform Commercial Code (3d Ed.) 381, Section 9–503:137. The secured party may hire another to make the repossession, and the right of repossession accrues to the hired entity. Id. See also *Akerlund v. TCF Natl. Bank of Minn.* (Jun. 11, 2001), D.Minn. No. CIV. 99–1537(MJD/JGL), 2001 WL 1631440 (an independent contractor operating on behalf of a secured party was governed by the standards of conduct set forth in the Minnesota statute premised

on former U.C.C. 9–503). Here Ford, the "secured party," hired ARS to repossess the vehicles, and thus, ARS operated under the auspices of R.C. 1309.609.

{¶ 38} Appellants also argue that ARS cannot rely on R.C. 1309.609 to escape liability for conversion because that statute violates the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and Section 14, Article I of the Ohio Constitution.[10]

{¶ 39} Our analysis of the constitutionality of R.C. 1309.609 is guided by the strong presumption of constitutionality that all statutes enjoy. *Kaminski v. Metal & Wire Prods. Co.*, 125 Ohio St.3d 250, 2010-Ohio-1027, 927 N.E.2d 1066, ¶ 58. "Before a court may declare unconstitutional an enactment of the legislative branch, 'it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible.' " *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 25, quoting *State ex rel. Dickman v. Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59, paragraph one of the syllabus.

{¶ 40} As an initial matter, we find that the Fifth Amendment is irrelevant to the instant matter. The Due Process Clause of the Fifth Amendment applies to the federal government, not state government. *Dusenbery v. United States* (2002), 534 U.S. 161, 167, 122 S.Ct. 694, 151 L.Ed.2d 597. Appellant, therefore, cannot rely on the Fifth Amendment as a basis for arguing that a state statute is unconstitutional.

{¶ 41} The Fourth Amendment, as applied to the states through the Fourteenth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution prohibit the government from conducting unreasonable searches and seizures of persons or their property. The Fourteenth Amendment precludes state government from depriving any person of life, liberty, or property without due process of law. Notably, both the Fourth and Fourteenth Amendments provide protection against governmental—not private—action. *United States v. Jacobsen* (1984), 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (the Fourth Amendment's protection against unlawful searches and seizures "proscribe[s] only governmental action"); *Blum v. Yaretsky* (1982), 457 U.S. 991,

---

**10.** Appellants failed to argue before the trial court that R.C. 1309.609 violates Section 14, Article I of the Ohio Constitution. Normally, this failure would result in forfeiture of the argument, and we would refuse to consider it. *State ex rel. Ohio Civ. Serv. Emp. Assn., AFSCME, Loc. 11, AFL–CIO v. State Emp. Relations Bd.*, 104 Ohio St.3d 122, 2004-Ohio-6363, 818 N.E.2d 688, ¶ 10. We will, however, address appellants' argument because the language of Section 14, Article I of the Ohio Constitution is virtually identical to the language of the Fourth Amendment to the United States Constitution. Appellants' argument before the trial court included the assertion that R.C. 1309.609 violated the Fourth Amendment.

1002, 102 S.Ct. 2777, 73 L.Ed.2d 534, quoting *Shelley v. Kraemer* (1948), 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (" 'the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States' " and " '[t]hat Amendment erects no shield against merely private conduct, however discriminatory or wrongful' "); *Burdeau v. McDowell* (1921), 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (the Fourth Amendment "was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies").

{¶ 42} Enactment of a statute that permits self-help repossession does not amount to the significant state involvement necessary for the Fourth and Fourteenth Amendments to apply. *Winfield v. Soc. Natl. Bank* (C.A.6, 1988), 845 F.2d 328 (table) (finding former R.C. 1309.46, the predecessor to R.C. 1309.609, constitutional). See also *Gary v. Darnell* (C.A.6, 1974), 505 F.2d 741, 741–742; *Turner v. Impala Motors* (C.A.6, 1974), 503 F.2d 607, 611–612; *Gibbs v. Titelman* (C.A.3, 1974), 502 F.2d 1107, 1113; *James v. Pinnix* (C.A.5, 1974), 495 F.2d 206, 209; *Nowlin v. Professional Auto Sales, Inc.* (C.A.8, 1974), 496 F.2d 16, 17; *Adams v. S. California First Natl. Bank* (C.A.9, 1974), 492 F.2d 324, 329; *Shirley v. State Natl. Bank of Connecticut* (C.A.2, 1974), 493 F.2d 739, 743–745.[11] State statutes, like R.C. 1309.609, that authorize but do not compel private conduct do not satisfy the state action requirement. *Penney v. First Natl. Bank of Boston* (1982), 385 Mass. 715, 719, 433 N.E.2d 901; *Helfinstine v. Martin* (Okla.1977), 561 P.2d 951, 956; *Teeter Motor Co., Inc. v. First Natl. Bank of Hot Springs* (1976), 260 Ark. 764, 767–768, 543 S.W.2d 938; *Faircloth v. Old Natl. Bank of Washington* (1976), 86 Wash.2d 1, 4, 541 P.2d 362; *Benschoter v. First Natl. Bank of Lawrence* (1975), 218 Kan. 144, 150–151, 542 P.2d 1042; *Brown v. United States Natl. Bank of Oregon* (1973), 265 Or. 234, 238, 509 P.2d 442. Thus, we conclude that R.C. 1309.609 does not violate the Fourth or Fourteenth Amendments.

{¶ 43} Having addressed the repossessions that occurred on February 7 and 8, 2006, we now examine the final repossession to determine if a question of fact exists as to whether ARS breached the peace. Unlike the February 7 and 8, 2006 repossessions, the January 12, 2006 repossession of the Premier occurred over James's objection. On January 12, 2006, at approximately 8:15 a.m., James was dressing when his wife told him that someone with a tow truck was in their carport. James went out to the carport and found an ARS agent hooking the

---

11. Many of these cases actually address whether passage of the self-help repossession statute at issue qualified as action "under color of state law" for Section 1983 purposes. However, conduct that satisfies the "color of state law" test also constitutes state action. *Brentwood Academy v. Tenn. Secondary School Athletic Assn.* (2001), 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807, fn. 2.

Premier to his tow truck. James told the ARS agent to stop, unhook the Premier, and leave the premises because he was trespassing. James then reached down to unhook the Premier, and the ARS agent grabbed his hands, pushed him, and began screaming at him. According to James, the ARS agent screamed, "I'm going to make your neighbors know about what you're doing[;] you rich bastard, I got you." At that point, James began pushing back and yelling. James eventually backed away, and the ARS agent towed the Premier away.

{¶ 44} Based upon this evidence, a reasonable finder of fact could conclude that a breach of the peace occurred. If the finder of fact reached such a conclusion, then it could also find ARS liable for conversion. Accordingly, we conclude that the trial court erred in granting ARS summary judgment on James's claim for conversion of the Premier.

{¶ 45} Next, we consider whether the trial court erred in granting ARS summary judgment on appellants' claims that an ARS agent assaulted them during the January 12, 2006 repossession. A plaintiff establishes the tort of assault by showing that the defendant willfully threatened or attempted to harm or offensively touch the plaintiff and that the threat or attempt reasonably placed the plaintiff in fear of such contact. *Stafford v. Columbus Bonding Ctr.*, 177 Ohio App.3d 799, 2008-Ohio-3948, 896 N.E.2d 191, ¶ 15.

{¶ 46} Although Carolyn entered the carport briefly during the repossession, she returned to the house after seeing her husband reach down to unhook the Premier. Based on Carolyn's recounting of the events of January 12, 2006, the ARS agent never threatened or attempted to contact her. Consequently, reasonable minds could only conclude that the ARS agent did not assault Carolyn, and thus, the trial court properly granted ARS summary judgment on Carolyn's assault claim.

{¶ 47} The situation is different as to James. The ARS agent physically prevented James from unhooking the Premier from the tow truck. James testified that he backed away. He said, "[The ARS agent was] about 30 years younger than I am and about another 150 pounds heavier than I was." In his July 25, 2008 deposition, James stated repeatedly that he had felt threatened by the ARS agent. Despite this evidence, ARS argues that James's actions demonstrated frustration or anger—not fear. We believe that reasonable minds could disagree regarding how to interpret James's actions and whether he reasonably feared that the ARS agent would strike him. We therefore conclude that the trial court erred in granting ARS summary judgment on James's assault claim.

{¶ 48} Next, we must determine whether summary judgment was appropriate on appellants' claims for violation of Section 1983. Section 1983

"provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.' " *Lugar v. Edmondson Oil Co., Inc.* (1982), 457 U.S. 922, 924, 102 S.Ct. 2744, 73 L.Ed.2d 482, quoting Section 1983. A person is acting under the color of state law if "the conduct allegedly causing the deprivation of a federal right [can] be fairly attribut[ed] to the State." Id. at 937. For fair attribution to the state to exist, the person charged with committing the deprivation "must be a person who may fairly be said to be a state actor." Id. "This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." Id.

{¶ 49} In the case at bar, appellants argue that ARS is a state actor because the Public Utilities Commission of Ohio regulates it. Appellants neither asserted nor presented any evidence to support this argument in the trial court. Moreover, we note that " '[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State.' " *Am. Mfrs. Mut. Ins. Co. v. Sullivan* (1999), 526 U.S. 40, 52, 119 S.Ct. 977, 143 L.Ed.2d 130, quoting *Jackson v. Metro. Edison Co.* (1974), 419 U.S. 345, 350, 95 S.Ct. 449, 42 L.Ed.2d 477.

{¶ 50} Appellants also claim that ARS is a state actor because it repossessed the vehicles with the authorization of R.C. 1309.609. However, "the existence of [a] self-help repossession provision in state law, and [a party's] use of the same to effectuate [a] repossession, is not enough, on its own" to convert a private repossessor into a state actor. *Albertorio–Santiago v. Reliable Fin. Servs.* (D.P.R.2009), 612 F.Supp.2d 159, 166. See also *Elliott v. Chrysler Fin.* (C.A.10, 2005), 149 Fed.Appx. 766, 768 ("Merely following a procedure established by state law does not transform a private party's activity into state action"); *Pahls v. Kesselring* (C.A.6, 2000), 230 F.3d 1359 (table) ("simply invoking the authority of a valid state law does not amount to state action for § 1983 purposes"). As both appellants' arguments fail, we conclude that ARS is not a state actor, and thus, the trial court properly granted ARS summary judgment on appellants' Section 1983 claims.

{¶ 51} We next turn to the trial court's grant of summary judgment on James's claim against ARS for the conversion of personal property that was in the Premier when ARS repossessed that vehicle on May 9, 2005. To clarify, ARS repossessed the Premier twice—first on May 9, 2005, and after James redeemed the Premier, then again on January 12, 2006. James asserted a claim against ARS for conversion of multiple items of personal property that were in the Premier when ARS repossessed it the first time. This personal property

included clothing, prescription eyeglasses, boating paraphernalia, CDs, and cash. After the repossession, James contacted ARS and requested the return of the personal property in the Premier and the vehicle's license plates. ARS returned only the license plates.

{¶ 52} Although R.C. 1309.609 permits a repossessor to lawfully take possession of another's vehicle, that permission does not extend to the personal items inside the vehicle. Consequently, even though a lawful repossession leaves the debtor with no claim for conversion of his vehicle, he may assert a conversion claim against the repossessor for any personal property taken with the vehicle and not returned. *Perkins v. City Natl. Bank & Trust Co.* (Mar. 22, 1977), 10th Dist. No. 76AP–730, 1977 WL 200020 (the plaintiff could recover for the conversion of personal items that "the defendant bank had no right, by virtue of the contractual arrangements of the parties on the security agreement, to repossess along with the motor home"). See also *McGrady v. Nissan Motor Acceptance Corp.* (M.D.Ala.1998), 40 F.Supp.2d 1323, 1330 ("Conversion may occur when, during a repossession, personal property located in the repossessed vehicle is taken. * * * [A]lthough the taking of the vehicle was lawful, the taking of Plaintiff's personal property * * * was not lawful"); Billings, Handling Automobile Warranty & Repossession Cases (2d Ed.2003), Section 11:47 ("Conversion may occur during an otherwise lawful repossession if the debtor's personal property is taken along with the automobile. The financier's security interest is in the automobile alone, and not in items located in it at the time of possession").

{¶ 53} Here, ARS does not dispute that when it repossessed the Premier in May 2005, the Premier contained personal items that it did not return to James. Accordingly, we conclude that the trial court erred in granting ARS summary judgment on James's claim for conversion of his personal property.

{¶ 54} In sum, we conclude that the trial court erred in granting ARS summary judgment on appellants' claims for trespass, James's claim for conversion of the Premier, James's claim for assault, and James's claim for conversion of personal property in the Premier. Consequently, we sustain appellants' second assignments of error to the extent that they challenge those rulings. In all other respects, we overrule appellants' second assignments of error.

{¶ 55} By their third assignments of error, appellants argue that the trial court erred in granting ARS summary judgment on their claims for intentional infliction of emotional distress. The third assignments of error also include a challenge to the trial court's determination that appellants could not recover punitive damages. Appellants, however, do not separately argue that point. We therefore decline to address it. App.R. 12(A)(2); *Bond,* 2008-Ohio-945, 2008 WL 600201, at ¶ 16–17.

{¶ 56} A defendant is liable for intentional infliction of emotional distress if his "extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another." *Yeager v. Loc. Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.* (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666, syllabus, abrogated on other grounds, *Welling v. Weinfeld,* 113 Ohio St.3d 464, 2007-Ohio-2451, 866 N.E.2d 1051. "Serious emotional distress" goes beyond merely trifling disturbance, mere upset, or hurt feelings. *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 78, 6 OBR 114, 451 N.E.2d 759. The emotional injury must be so severe and debilitating that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." Id. Serious emotional distress includes traumatically induced neurosis, psychosis, chronic depression, and phobia. Id.

{¶ 57} A plaintiff claiming serious emotional distress must present some " 'guarantee of genuineness' " in support of his claim to prevent summary judgment in favor of the defendant. *Powell v. Grant Med. Ctr.* (2002), 148 Ohio App.3d 1, 6, 771 N.E.2d 874, quoting *Paugh,* 6 Ohio St.3d at 76, 6 OBR 114, 451 N.E.2d 759. In most instances, a plaintiff can supply that genuineness with expert medical testimony. *Schultz v. Barberton Glass Co.* (1983), 4 Ohio St.3d 131, 135, 4 OBR 376, 447 N.E.2d 109. Such testimony, however, is not always necessary. *Powell,* 148 Ohio App.3d 1, 6–7, 771 N.E.2d 874. In lieu of expert testimony, a plaintiff may submit testimony of lay witnesses who "testify as to any marked changes in the emotional or habitual makeup that they discern in the plaintiff." *Paugh* at 80, 6 OBR 114, 451 N.E.2d 759. See also *Buckman–Peirson v. Brannon,* 159 Ohio App.3d 12, 2004-Ohio-6074, 822 N.E.2d 830, ¶ 41; *Powell* at 6–7. A court may decide whether the emotional injury alleged constitutes "serious emotional distress" as a matter of law. Id.

{¶ 58} In the case at bar, James testified that his interactions with the ARS agents have "shaken [him] up mentally" and that he "wake[s] up probably at least two times a night * * * to see if they've come to tow any cars." Carolyn stated that she was "truly frightened" by the ARS agents' behavior. Neither James nor Carolyn sought the treatment of a psychologist, psychiatrist, or any other mental-health provider as a result of their experiences with ARS. No expert medical witness testified regarding the Ryans' mental states, and no lay witness acquainted with the Ryans testified as to a marked change in their mental states.

{¶ 59} Given the state of the evidence, we conclude that no reasonable finder of fact could find that the Ryans have incurred the type of severe and debilitating emotional injury necessary for them to prevail on their claims for intentional infliction of emotional distress. Although the Ryans have felt emotional discom-

fort, as a matter of law their suffering did not rise to the level of serious emotional distress. See *Oglesby v. Columbus,* 10th Dist. No. 01AP–1289, 2002-Ohio-3784, 2002 WL 1726033, ¶ 29 (upholding summary judgment because reasonable minds could not conclude that the plaintiff had suffered severe emotional distress when the evidence established that the plaintiff felt humiliated, became emotional at times, and was unable to eat or sleep but never sought medical treatment for his distress).

{¶ 60} Appellants, however, assert that they had identified a physician who would have testified as to their extreme emotional stress. Appellants failed to introduce into the record any testimony from this physician in response to ARS's summary-judgment motion. Consequently, the physician's alleged opinion cannot factor into our review of the trial court's summary-judgment ruling.

{¶ 61} Because the evidence in the record does not establish severe emotional distress, the trial court properly granted ARS summary judgment on appellants' claims for intentional infliction of emotional distress. Accordingly, we overrule appellants' third assignments of error.

{¶ 62} By their fourth assignments of error, appellants attack the trial court's award of summary judgment to Ford on its claims. First, James argues that the trial court erred in declaring that the lease agreement and retail installment contracts specified that the co-obligors to those contracts were jointly and severally responsible for making the required payments. In making this argument, James misinterprets both the amended complaint and the trial court's summary-judgment ruling. Ford never sought a declaratory judgment as to the character of the co-obligors' liability under the relevant contracts. Ford, instead, filed four breach-of-contract claims. Consequently, in granting summary judgment to Ford, the trial court did not declare that James and RRI were jointly and severally liable under the lease agreement or that James and R & R were jointly and severally liable under the retail installment contracts.

{¶ 63} Moreover, in the amended judgment entry deciding Ford's summary-judgment motions, the trial court awarded damages consistent with Ford's concession that the co-obligors were only jointly liable under the contracts. The trial court specified that James and RRI were jointly liable for the $2,742.65 owed under the lease agreement, and it awarded Ford only half of the amounts due under the retail installment contracts.[12]

{¶ 64} Second, James argues that summary judgment was inappropriate because Ford failed to state any claims for relief in its amended complaint.

---

12. Because Ford neglected to join R & R, James's co-obligor, as a party, the trial court awarded Ford only the portion of damages attributable to James for the breach of the retail installment contracts.

Specifically, James claims that Ford did not allege in the amended complaint that he and his co-obligors defaulted on the contracts. James also claims that Ford neglected to comply with Civ.R. 10(D)(1). The record belies both claims. Ford alleged that James and his co-obligors had defaulted on their payment obligations when it stated that those obligations were "past due," and it specified the amounts owing under each contract. Also, pursuant to the dictates of Civ.R. 10(D)(1), Ford attached the lease agreement to its original complaint, and it attached the retail installment contracts to its amended complaint. Consequently, we conclude that Ford appropriately pleaded the breach-of-contract claims for which it later sought summary judgment.

{¶ 65} Third, James argues that the trial court erred in granting summary judgment on Ford's claims for breach of the retail installment contracts because Ford never made R & R a party to the action. As we explained above, James copurchased three vehicles with R & R, and thus both James and R & R are liable for the debt to Ford. Although Ford sued James for breach of the retail installment contracts arising from the purchase of those three vehicles, it did not also sue R & R. James argues that R.C. 2721.12(A) required Ford to join R & R, and Ford's failure to do so rendered the trial court's judgment void. R.C. 2721.12(A) states, "[W]hen declaratory relief is sought under [R.C. Chapter 2721] in an action or proceeding, all persons who have or claim any interest that would be affected by the declaration shall be made parties to the action or proceeding." This statute is inapplicable here because Ford did not seek declaratory relief.

{¶ 66} James also argues that Civ.R. 10(A) necessitated the joinder of R & R. Civ.R. 10(A) merely requires that the title of a complaint "include the names and addresses of all the parties." It does not list criteria for determining what parties are necessary to an action.

{¶ 67} Although James never cites it, Civ.R. 19 is the applicable authority. *State ex rel. Gill v. Winters* (1990), 68 Ohio App.3d 497, 503, 589 N.E.2d 68 (Civ.R. 19 "describes persons whose presence is needed for a just adjudication of the action"). Civ.R. 19(A) provides:

A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (a) as a practical matter impair or impede his ability to protect that interest or (b) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest * * *.

An appellate court reviews a trial court's decision whether a person is a necessary party under an abuse-of-discretion standard. *Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179, 184, 12 OBR 246, 465 N.E.2d 1298.

{¶ 68} Here, R & R is not a necessary party under Civ.R. 19(A)(1) because a court can accord complete relief among Ford and James. A creditor who sues a co-obligor for his portion of the debt can receive from that obligor the complete relief it requests (i.e., half of the debt). *Davis v. Middleton* (May 28, 1985), 12th Dist. No. CA84–08–054, 1985 WL 8677. Consequently, the other co-obligor is not a necessary party to the suit. Id.

{¶ 69} R & R also fails to qualify as a necessary party under Civ.R. 19(A)(2). R & R's absence from the instant case does not "as a practical matter impair or impede [its] ability to protect" its interest in the repossessed vehicles. Civ.R. 19(A)(2)(a). James is a party to this case, and as the 100 percent shareholder in R & R, James's interests are completely aligned with R & R's interests. Thus, James can fully protect R & R's interests. Moreover, James is not "subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Civ.R. 19(A)(2)(b). As we explained above, the trial court entered judgment against James for only the portion of the debt that he owed. Accordingly, we conclude that the trial court did not abuse its discretion in refusing to join R & R as a party. James, therefore, cannot use the lack of joinder as a reason to overturn the trial court's award of summary judgment to Ford on its breach-of-contract claims.

{¶ 70} Because James does not prevail on any of his arguments, we overrule his fourth assignment of error. Likewise, we overrule Carolyn's fourth assignment of error. Carolyn merely adopted James's arguments in support of her fourth assignment of error, and none of those arguments challenge the grant of summary judgment on Ford's breach-of-contract claim against her.

{¶ 71} By their fifth assignments of error, appellants argue that the trial court erred in granting summary judgment to Ford and Bob–Boyd on appellants' CSPA claims. While we agree with appellants that Carolyn's CSPA claim against Bob–Boyd should have survived summary judgment, we find that the trial court appropriately awarded summary judgment on James's CSPA claims and Carolyn's CSPA claim against Ford.

{¶ 72} R.C. 1345.02 and 1345.03 prohibit suppliers from engaging in unfair, deceptive, or unconscionable practices "in connection with a consumer transaction." A "consumer transaction" means "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household." R.C. 1345.01(A). The definition of "consumer transaction" does not include "transactions between persons, defined in sections 4905.03 and 5725.01 of

the Revised Code, and their customers." [13]   Id.   The "persons" listed in R.C. 5725.01 include "dealers in intangibles," which R.C. 5725.01(B)(1) defines as follows:

> [E]very person who keeps an office or other place of business in this state and engages at such office or other place in a business that consists primarily of lending money, or discounting, buying, or selling bills of exchange, drafts, acceptances, notes, mortgages, or other evidences of indebtedness.

{¶ 73} In the case at bar, Ford claims that appellants cannot sue it for violation of the CSPA because it is a "dealer in intangibles." Ford attached to its motion for summary judgment the affidavit of Randall E. Golliher, a territory sales manager for Ford, in which Golliher testified that Ford maintained an office in Ohio from 2003 through 2006. Golliher also stated that at that office, Ford engaged in a business that primarily consisted of lending money or discounting, buying, or selling bills of exchange, drafts, acceptances, notes, mortgages, or other evidences of indebtedness. Appellants offer no evidence to rebut Golliher's affidavit. Accordingly, as Ford presented uncontradicted evidence that it qualifies as a "dealer in intangibles," appellants' CSPA claims against Ford must fail. See *Reagans v. MountainHigh Coachworks, Inc.*, 117 Ohio St.3d 22, 2008-Ohio-271, 881 N.E.2d 245, ¶ 33 ("As a general matter, transactions between financial institutions and their customers are exempted from the definition of a 'consumer transaction' subject to the Consumer Sales Practices Act"); *Columbus Mtge., Inc. v. Morton*, 10th Dist. No. 06AP–723, 2007-Ohio-3057, 2007 WL 1748142, ¶ 53–59 (affirming the grant of summary judgment on a CSPA claim because the transaction at issue involved a dealer in intangibles).

{¶ 74} James, however, argues that Ford has derivative liability for Bob–Boyd's misconduct because the retail installment contracts contain the notice mandated by 16 C.F.R. 433.2, a Federal Trade Commission ("FTC") regulation.[14] Inclusion of the FTC-mandated notice in a consumer credit contract subjects a creditor to the claims the consumer debtor has against the seller of the goods financed by the credit contract. *Reagans*, 117 Ohio St.3d 22, 2008-Ohio-271, 881 N.E.2d 245, at ¶ 22. See also *Milchen v. Bob Morris Pontiac–GMC Truck* (1996), 113 Ohio App.3d 190, 195–197, 680 N.E.2d 698 (although a financial

---

13. R.C. 1345.01(A) exempts certain types of transactions from this exception to the definition of "consumer transaction." None of those exemptions are applicable here.

14. In compliance with 16 C.F.R. 433.2, the notice in the retail installment contracts reads, "NOTICE—ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER."

institution could not be directly liable under the CSPA, it could be derivatively liable for the seller's violations of the CSPA due to the inclusion of the FTC-mandated notice). Thus, James argues that he can assert a CSPA claim against Ford despite its being a "dealer in intangibles."

{¶ 75} James acknowledges that he raises this argument for the first time before this court. Ordinarily, such a belated assertion of an argument results in its forfeiture. *State ex rel. Ohio Civ. Serv. Emp. Assn.*, 104 Ohio St.3d 122, 2004-Ohio-6363, 818 N.E.2d 688, at ¶ 10. James contends that he did not forfeit this argument because Ford did not attach the page of the retail installment contracts that contained the FTC-mandated notice to its summary-judgment motion. James is mistaken. Ford included that page in the copies of the retail installment contracts reproduced in the appendix to its motion. Thus, we decline to consider James's argument.

{¶ 76} Unlike Ford, Bob–Boyd does not claim to be a "dealer in intangibles." Rather, Bob–Boyd argues that summary judgment was warranted on appellants' CSPA claims against it because appellants did not purchase their vehicles for primarily personal, family, or household purposes.

{¶ 77} A consumer cannot recover under the CSPA unless he entered into a "consumer transaction," i.e., a purchase made for primarily personal, family, or household purposes. R.C. 1345.01(A); *Giffin v. Crestview Cadillac*, 10th Dist. No. 09AP–278, 2009-Ohio-6569, 2009 WL 4809862, ¶ 21. Purchases of goods for primarily business purposes are not "consumer transactions" and thus cannot support a CSPA claim. Id. at ¶ 21. When deciding whether a "consumer transaction" occurred, "courts look to 'the point in time when the parties have entered a binding agreement.'" Id. at ¶ 22, quoting *Tomes v. George P. Ballas Leasing, Inc.* (Sept. 30, 1986), 6th Dist. No. L–85–359, 1986 WL 11420. Courts then examine the "objective manifestations" that the purchaser made at that time regarding how he intended to use the purchased item. Id. If the purchaser's intentions are unclear, then courts apply the "principal use" test. Id. at ¶ 26. The outcome of the principal-use test depends on how the owner of the item uses that item after its purchase. Id. at ¶ 25. "Factors include 'total time used for business versus total time used for personal activities, evidence of compensation for business use either from an employer or by way of deduction, as well as relative mileage.'" Id. at ¶ 25, quoting *Jackson v. Krieger Ford, Inc.* (Mar. 28, 1989), 10th Dist. No. 88AP–1030, 1989 WL 29351.

{¶ 78} Here, as to the Premier, James made no objective manifestations regarding how he intended to use the vehicle. Although the retail installment contract contained a section in which the purchaser could indicate the "Use For Which Purchased," that section is blank. As to the Monterey and Mountaineer,

James made conflicting objective manifestations regarding his purpose. James checked the "personal" box in the section of the retail installment contracts entitled "Use For Which Purchased." However, James purchased each vehicle jointly with a corporation—R & R. By definition, a corporation purchases goods only for business purposes.

{¶ 79} Ford recognized the inconsistency created by the representation that a corporation purchased the vehicles for personal use. Upon review of the retail installment contracts for the purchases of the Monterey and Mountaineer, Ford sent letters to R & R indicating that "[t]he Personal Use box is checked incorrectly" and "[t]he correct use for which [the vehicle was] purchased is Commercial."

{¶ 80} Based upon the totality of the evidence, we conclude that the objective manifestations regarding the intended use were either nonexistent or ambiguous. Thus, we turn to the principal-use test to determine whether the vehicles were purchased for personal or business purposes.

{¶ 81} After purchase, the vehicles were titled in the name of R & R. Additionally, R & R depreciated the vehicles as business assets on its 2004 federal tax return. That tax return indicates that in 2004, 90 percent of the Monterey's use was for business purposes, 85 percent of the Mountaineer's use was for business purposes, and 95 percent of the Premier's use was for business purposes. Accordingly, we conclude that James purchased the vehicles for primarily business, not personal, use. Because the purchases do not qualify as "consumer transactions," James's CSPA claims against Bob–Boyd must fail.

{¶ 82} We reach the opposite conclusion on Carolyn's CSPA claim against Bob–Boyd. Unlike James, Carolyn did not co-purchase her vehicle with a corporation. The only objective manifestation as to Carolyn's purpose is that she checked the "personal" box when designating the purpose for which she purchased the car. Therefore, we conclude that Carolyn engaged in a "consumer transaction," and thus, the trial court erred in granting summary judgment on her CSPA claim against Bob–Boyd.

{¶ 83} In sum, we overrule James's fifth assignment of error. We overrule Carolyn's fifth assignment of error to the extent it challenges the trial court's summary-judgment ruling as to Ford, but we sustain that assignment of error to the extent it challenges the trial court's ruling as to Bob–Boyd.

{¶ 84} By his sixth assignment of error, James argues that the trial court erred in granting Ford's motion for an order exercising jurisdiction over the Premier and denying its return to him. The decision at issue arose due to a mix-up that occurred when ARS repossessed the Premier on January 12, 2006. Originally, the ARS agent had gone to the Ryans' home to repossess a 2001

Mercury Villager, but instead, he mistakenly hooked the Premier to his tow truck. After a physical confrontation with James, the ARS agent towed away the Premier. Ford later sued James for breach of contract for his failure to make payments on the Villager, and that case was assigned to Judge Schneider. James moved for an order directing Ford to return the Premier to him. Ford responded that because James had defaulted on his obligation to pay for the Premier, the repossession of the Premier was lawful. Ford informed Judge Schneider that a breach-of-contract claim as to the Premier was pending in front of Judge Lynch. In his December 28, 2005 decision granting James's motion, Judge Schneider ruled:

> [T]he present case does not concern the 2004 Mercury Mountaineer Premier vehicle, and so plaintiff's retaining possession of this vehicle through proceedings in the present case is unwarranted. However, the effective date of this decision shall be delayed ten (10) days to give plaintiff an opportunity to obtain a determination as to possession of this vehicle from Judge Lynch, if desired.

{¶ 85} Ford then filed a motion before Judge Lynch requesting that she exercise jurisdiction over the Premier and deny the return of the Premier to James. Eventually, Judge Lynch granted that motion.

{¶ 86} The decision at issue is interlocutory and unrelated to the final judgments that resolved the claims of and against Ford, ARS, and Bob–Boyd. Consequently, this judgment is not yet ripe for appeal. *Haley*, 2009-Ohio-447, 2009 WL 250871, at ¶ 11–12; *Davis*, 2008-Ohio-3501, 2008 WL 2700008, at ¶ 6. Once the trial court enters a final order that disposes of the entirety of the instant case, James, if he chooses, may appeal this decision. We thus dismiss James's sixth assignment of error.

{¶ 87} Having addressed appellants' first appeals, we now turn to their second appeals. By their first assignments of error, appellants argue that the trial court erred in granting summary judgment to Bob–Boyd on appellants' claims for breach of contract, estoppel, and violation of the CSPA.[15] We have addressed the CSPA claims above, so we need only consider whether summary judgment was appropriate on appellants' claims for breach of contract and estoppel.

{¶ 88} Appellants claim that Bob–Boyd breached the retail installment contracts by repossessing the vehicles that secured the debt in the absence of any default. Bob–Boyd responds that although it initially executed the retail installment contracts, it subsequently assigned those contracts to Ford. Pointing to

---

15. Appellants also claim that the trial court erred in granting summary judgment to Bob–Boyd on their claims for negligent misrepresentation and violation of the RISA. Appellants did not assert either of these claims against Bob–Boyd in their counterclaims. As these claims are not part of this case, we will not consider them.

those assignments, Bob–Boyd argues that it is no longer a party to the contracts, and thus, it cannot be liable for any breach of the contracts.

{¶ 89} An assignment is a transfer of property or of some right or interest from one person to another that causes the property, right, or interest to vest in the other person. *Siebert v. Columbus & Franklin Cty. Metro. Park Dist.* (Dec. 28, 2000), 10th Dist. No. 00AP–583, 2000 WL 1877585; *Leber v. Buckeye Union Ins. Co.* (1997), 125 Ohio App.3d 321, 332, 708 N.E.2d 726. Generally, an assignment extinguishes the right in the assignor and transfers it to the assignee. *Griffin v. Porco* (Apr. 24, 1996), 1st Dist. No. C–941013, 1996 WL 194242. The assignee "stands in the shoes of the assignor" and "succeeds to all the rights and remedies of the latter." *Inter Ins. Exchange of Chicago Motor Club v. Wagstaff* (1945), 144 Ohio St. 457, 460, 30 O.O. 44, 59 N.E.2d 373.

{¶ 90} In the case at bar, Bob–Boyd relied on the affidavit of William L. Dawes, Bob–Boyd's dealer-operator, president, and co-owner, to prove its entitlement to summary judgment on the breach-of-contract claim. Dawes testified that after entering into the retail installment contracts, Bob–Boyd assigned them to Ford. Faced with this evidence, appellants concede that Bob–Boyd assigned the retail installment contracts to Ford. Appellants, however, argue that Bob–Boyd has "probable remaining interests" under the contracts. Because appellants offer nothing but speculation to support this argument, we reject it.

{¶ 91} Appellants also argue that Bob–Boyd did not assign the purchase orders for the vehicles to Ford. While this may be true, it is inconsequential. Appellants did not assert a claim against Bob–Boyd for a breach of the purchase orders.

{¶ 92} By assigning the retail installment contracts, Bob–Boyd transferred its interest in the contracts and does not retain any interest in them. We thus conclude that the trial court properly granted Bob–Boyd summary judgment on appellants' breach-of-contract claims.

{¶ 93} Next, appellants contend that their estoppel claims should have survived Bob–Boyd's summary-judgment motion. Appellants claim that Bob–Boyd informed them that the contract extensions that Ford granted them were valid and enforceable. Appellants maintain that they relied on this representation to their detriment, and thus, Bob–Boyd should be estopped from denying that it made the representation.

{¶ 94} Bob–Boyd presents two arguments in response. First, Bob–Boyd argues that appellants are seeking equitable estoppel, which is an affirmative defense and not a cause of action. Equitable estoppel precludes recovery " 'when one party induces another to believe certain facts exist and the other party changes his position in reasonable reliance on those facts to his detriment.' " *Doe v. Archdiocese of Cincinnati*, 116 Ohio St.3d 538, 2008-Ohio-67, 880

N.E.2d 892, ¶ 7, quoting *State ex rel. Chavis v. Sycamore City School Dist. Bd. of Edn.* (1994), 71 Ohio St.3d 26, 34, 641 N.E.2d 188. Promissory estoppel allows recovery of damages when a defendant makes " '[a] promise which the [defendant] should reasonably expect to induce action or forbearance on the part of the [plaintiff] * * * and which does induce such action or forbearance.' " *Hortman v. Miamisburg,* 110 Ohio St.3d 194, 2006-Ohio-4251, 852 N.E.2d 716, ¶ 23, quoting Restatement of the Law 2d, Contracts (1981), Promise Reasonably Inducing Action or Forbearance, Section 90. The key distinction between the two doctrines is that equitable estoppel arises from a misrepresentation of fact, while promissory estoppel arises from a promise. *Hortman* at ¶ 24. Moreover, equitable estoppel is a defense to a legal or equitable claim, while promissory estoppel is a cause of action. *Stern v. Shainker,* 8th Dist. No. 92301, 2009-Ohio-2731, 2009 WL 1636173, ¶ 11–12; *Callander v. Callander,* 10th Dist. No. 07AP–746, 2008-Ohio-2305, 2008 WL 2026431, ¶ 31; *Holt Co. of Ohio v. Ohio Mach. Co.,* 10th Dist. No. 06AP–911, 2007-Ohio-5557, 2007 WL 3027084, ¶ 28. Equitable estoppel is a shield; promissory estoppel is a sword. *Stern* at ¶ 12; *Callander* at ¶ 31; *Holt Co.* at ¶ 28; *First Fed. S. & L. Assn. of Toledo v. Perry's Landing, Inc.* (1983), 11 Ohio App.3d 135, 144, 11 OBR 215, 463 N.E.2d 636.

{¶ 95} We agree with Bob–Boyd that appellants appear to be seeking recovery for equitable estoppel. Appellants allege that Bob–Boyd made a misrepresentation, not a promise, which they detrimentally relied upon. Because equitable estoppel does not constitute a cause of action, appellants cannot prevail on such a "claim."

{¶ 96} Additionally, even if we construe appellants' claims as claims for promissory estoppel, Bob–Boyd presents a persuasive argument preventing appellants' recovery. In order to prove a claim for promissory estoppel, a plaintiff must establish (1) a clear, unambiguous promise, (2) that the person to whom the promise was made relied on the promise, (3) that reliance on the promise was reasonable and foreseeable, and (4) that the person claiming reliance was injured as a result of reliance on the promise. *Pappas v. Ippolito,* 177 Ohio App.3d 625, 2008-Ohio-3976, 895 N.E.2d 610, ¶ 55. Bob–Boyd contends that appellants cannot prove that they reasonably relied on Bob–Boyd's "promise" because they knew that Ford was the party to whom they owed payment for the vehicles. Thus, Bob–Boyd posits, appellants understood that Ford—not Bob–Boyd—controlled whether they would receive extensions on their payment obligations. The evidence supports Bob–Boyd's argument. James testified that he arranged payment extensions with Ford. James understood that Ford was the creditor who had provided the financing for the vehicles and that Ford instrumented the repossessions. Therefore, we conclude that no reasonable finder of

fact could find that appellants reasonably relied on anything Bob–Boyd "promised" regarding payments appellants owed Ford.

{¶ 97} In sum, we conclude that the trial court properly granted summary judgment to Bob–Boyd on appellants' claims for breach of contract and estoppel and on James's claim for violation of the CSPA. The trial court, however, erred in granting Bob–Boyd summary judgment on Carolyn's claim for violation of the CSPA. We thus sustain the first assignments of error as to Carolyn's CSPA claim only. In all other respects, we overrule the first assignments of error.

{¶ 98} By James's fourth assignment of error, he argues that R.C. 1309.609 violates the Fourth and Fourteenth Amendments to the United States Constitution, as well as Sections 1, 16, and 19, Article I of the Ohio Constitution. For the most part, we have already considered and rejected this argument. In this assignment of error, James relies on additional sections of the Ohio Constitution to bolster his earlier-asserted challenge to R.C. 1309.609's constitutionality. James, however, has forfeited any argument based on the Ohio Constitution because he failed to assert such an argument before the trial court. *State ex rel. Ohio Civ. Serv. Emp. Assn.*, 104 Ohio St.3d 122, 2004-Ohio-6363, 818 N.E.2d 688, at ¶ 10. Accordingly, we overrule James's fourth assignment of error.

{¶ 99} Next, we consider James's fifth and Carolyn's fourth assignments of error. By those assignments of error, appellants argue that the trial court erred in denying their Civ.R. 56(F) motions. For the reasons discussed above, we strike these assignments of error to the extent that they pertain to ARS. We will, however, review whether the trial court erred in denying the Civ.R. 56(F) motion that appellants filed seeking a continuance to respond to Ford's motion for summary judgment.

{¶ 100} Pursuant to Civ.R. 56(F), a party may seek additional time in which to develop the facts needed to adequately oppose a motion for summary judgment. *Hatton v. Interim Health Care of Columbus, Inc.*, 10th Dist. No. 06AP–828, 2007-Ohio-1418, 2007 WL 902176, ¶ 10. The party seeking the Civ.R. 56(F) continuance bears the burden of establishing why the party cannot present sufficient facts to justify its opposition to a motion for summary judgment without a continuance. *Perpetual Fed. Sav. Bank v. TDS2 Prop. Mgt., L.L.C.*, 10th Dist. No. 09AP–285, 2009-Ohio-6774, 2009 WL 4936380, ¶ 13; *Waverly City School Dist. Bd. of Edn. v. Triad Architects, Inc.*, 10th Dist. No. 08AP–329, 2008-Ohio-6917, 2008 WL 5423269, ¶ 17. The moving party cannot meet this burden with mere allegations; rather, the moving party must aver in an affidavit a particularized factual basis that explains why further discovery is necessary. *Morantz v. Ortiz*, 10th Dist. No. 07AP–597, 2008-Ohio-1046, 2008 WL 642630, ¶ 22; *Hahn v. Groveport*, 10th Dist. No. 07AP–27, 2007-Ohio-5559, 2007 WL 3027075, ¶ 30.

Absent an abuse of discretion, an appellate court will not reverse a trial court's ruling on a Civ.R. 56(F) motion. *State ex rel. Sawyer v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 110 Ohio St.3d 343, 2006-Ohio-4574, 853 N.E.2d 657, ¶ 9.

{¶ 101} Appellants expressed two motivations for filing their Civ.R. 56(F) motion. First, appellants' attorney, Ira B. Sully, explained that his co-counsel had withdrawn from the case approximately one week before Ford filed its motion for summary judgment. Apparently, the co-counsel had maintained the case file. Although the co-counsel claimed that he had delivered the entire case file to Sully, Sully believed that the file was incomplete. Sully sought additional time to review the court filings and discovery. Second, appellants wished to conduct additional discovery regarding whether ARS was acting as an agent or an independent contractor for Ford.

{¶ 102} Sully faced a difficult task in assuming the role as appellants' primary counsel immediately before an opposing party filed a motion for summary judgment. However, as the trial court noted, Sully initially appeared in the case in May 2006—approximately three years before Ford sought summary judgment. Sully, therefore, was familiar with the facts and issues raised in Ford's motion. Additionally, although Sully claimed that the case file appeared incomplete, he failed to explain in his affidavit what documents were missing or how the absence of those documents adversely impacted his ability to respond to Ford's motion. Thus, the trial court was not persuaded by his plea for additional time to prepare a response.

{¶ 103} The trial court also rejected appellants' bid for additional time to conduct discovery, stating that the discovery deadline had passed and that trial was only weeks away. In an agreed scheduling order filed on October 27, 2008, the parties agreed to April 13, 2009, as the discovery-cut-off date. Ford originally filed its motion for summary judgment, in which it argued that ARS was an independent contractor, on September 30, 2008.[16] Thus, at the time appellants' attorneys (including Sully) agreed to the April 13, 2009 discovery deadline, they were aware of the independent-contractor issue. Apparently, appellants neither sought discovery on the issue nor requested an extension of the discovery deadline.

{¶ 104} Given Sully's previous involvement in the case and appellants' lack of diligence in conducting discovery, we cannot conclude that the trial court abused

---

16. Appellants objected to Ford's original summary-judgment motion on the basis that they had yet to conduct discovery. The trial court did not rule on Ford's motion. On March 16, 2009, Ford filed a renewed motion for summary judgment, asserting the same arguments made in the original motion. Appellants moved for Civ.R. 56(F) relief in response to the renewed motion.

its discretion in denying appellants' Civ.R. 56(F) motion. Accordingly, we overrule James's fifth and Carolyn's fourth assignments of error.

{¶ 105} By James's sixth assignment of error, he argues that the trial court erred in granting Ford's motion for an order exercising jurisdiction over and denying the return of the Premier. For the reasons discussed in response to James's sixth assignment of error in his first appeal, we dismiss this assignment of error.

{¶ 106} We next turn to James's seventh assignment of error and Carolyn's fifth assignment of error. By these assignments of error, appellants argue that the trial court erred in granting Ford summary judgment on its breach-of-contract claims and appellants' claims. First, appellants contend that Ford failed to produce any evidence proving that appellants had defaulted on their payment obligations. Appellants are wrong. Ford presented the trial court with the affidavits of two of its employees to establish appellants' defaults.

{¶ 107} First, Stephen Barbato, the center operations manager in the loss-prevention department at Ford's Greenville Service Center testified that (1) payment on the Premier was 61 days past due when ARS repossessed it, (2) payment on the Mountaineer was 55 days past due when ARS repossessed it, (3) payment on the Monterey was 22 days past due when ARS repossessed it, and (4) payment on Carolyn's Grand Marquis was 24 days past due when ARS repossessed it. Second, Barbara Travis, a center operations manager at Ford's National Recovery Center in Mesa, Arizona, testified that (1) the retail installment contract for the purchase of the Premier "has been and remains in default," with $3,481.79 due and owing on the account, (2) the retail installment contract for the purchase of the Mountaineer "has been and remains in default," with $8,784.40 due and owing on the account, (3) the retail installment contract for the purchase of the Monterey "has been and remains in default," with $3,224.74 due and owing on the account, (4) the retail installment contract for the purchase of Carolyn's Grand Marquis "has been and remains in default," with $8,635.24 due and owing on the account, and (5) the lease agreement for the lease of the Windstar "has been and remains in default," with $2,742.65 due and owing on the account.

{¶ 108} With these two affidavits, Ford established that each contract at issue was in default. Consequently, to avoid summary judgment, appellants had to present evidence creating a genuine issue of material fact as to the existence of the defaults or posit a legal reason why Ford could not recover on its claims. Appellants pursued the latter option, arguing that Ford waived the defaults by repeatedly accepting late payments from appellants. Appellants rely on *Slusser v. Wyrick* (1986), 28 Ohio App.3d 96, 97, 28 OBR 139, 502 N.E.2d 259, in which the Twelfth District held, "[T]he acceptance of late payments by a creditor who

has the statutory or contractual right to repossess the collateral estops the creditor from lawfully repossessing said collateral without notice after subsequent late payment default." Appellants assert, and Ford does not dispute, that Ford previously had accepted late payments from appellants. Additionally, appellants assert, and Ford does not dispute, that prior to initiating the repossessions, Ford did not notify appellants that they would have to strictly comply with the payment deadlines to avert repossession. Thus, appellants contend that, based on *Slusser*, Ford waived their defaults.

{¶ 109} Although application of the rule pronounced in *Slusser* could have conceivably precluded Ford from employing its contractual remedies for appellants' default, it does not prevent Ford from pursuing a claim for breach of contract against appellants. In other words, Ford's failure to notify appellants of its intent to strictly enforce the retail installment contracts would, at best, estop Ford from repossessing the vehicles. Contrary to appellants' reading of *Slusser*, failure to notify does not excuse the default. Thus, *Slusser* does not provide a defense to Ford's breach-of-contract claims for appellants' default on their payment obligations.

{¶ 110} In any event, Ford also contends that *Slusser* is inapplicable to the case at bar because the retail installment contracts contain an antiwaiver provision. Unlike the contract at issue in *Slusser*, the retail installment contracts include a provision intended to prevent waiver from arising from acceptance of late payments. Pursuant to Section E of the retail installment contracts:

> Acceptance of a late payment or late charge does not excuse your default or mean that you can keep making payments after they are due. The Creditor may take the steps set forth in this contract if there is any default.

Section G of the retail installment contracts specifies that Ford can repossess the vehicle that secures the debt if the debtor defaults.

{¶ 111} Typically, Ohio courts enforce antiwaiver clauses according to their terms. *Fields Excavating, Inc. v. McWane, Inc.*, 12th Dist. No. CA2008–12–114, 2009-Ohio-5925, 2009 WL 3721013, ¶ 35. Consistent with that general rule, this court has already indicated that an antiwaiver provision in a security agreement precludes the application of *Slusser*. *Pizarro v. Credit Acceptance Corp.* (2001), 10th Dist. No. 01AP–392, 2001 WL 1263682. As courts outside of Ohio have held, if an antiwaiver clause preserves the secured party's right to demand strict compliance with the contractual terms and the debtor's failure to comply with the terms would otherwise give rise to the right to repossession without notice, then the secured party may repossess without providing the debtor notice. *Minor v. Chase Auto Fin. Corp.*, —— S.W.3d ——, 2010 Ark. 246; *Williamson v. Nissan Motor Acceptance Corp.* (Ala.1993), 631 So.2d 241, 242; *Van Bibber v. Norris* (1981), 275 Ind. 555, 563–565, 419 N.E.2d 115; *Wade v.*

*Ford Motor Credit Co.* (E.D.Mo.1978), 455 F.Supp. 147, 149–150. Such a rule adheres to the general principle that "a security agreement is effective according to its terms between the parties." R.C. 1309.201(A).

{¶ 112} Here, the retail installment contracts warned appellants that Ford's acceptance of late payments did not prohibit Ford from repossessing the vehicles as a consequence of subsequent late payments. Pursuant to this contractual term, Ford had a right to repossess after *any* default on the payment obligation. Ford, therefore, did not have to notify appellants before repossessing their vehicles. Accordingly, we conclude that the trial court did not err in granting Ford summary judgment on its breach-of-contract claims against appellants.

{¶ 113} Appellants next argue that Ford is derivatively liable for the torts that ARS committed when it repossessed the vehicles. Ford contends that because ARS is an independent contractor, it is not liable for ARS's actions.

{¶ 114} Generally, an employer of an independent contractor is not liable for the acts of the independent contractor. *Pusey v. Bator* (2002), 94 Ohio St.3d 275, 278, 762 N.E.2d 968. Two exceptions to this general rule, each stemming from the nondelegable duty doctrine, apply here. Nondelegable duties arise from (1) affirmative duties that are imposed on the employer by statute, contract, franchise, charter, or common law and (2) duties imposed on the employer that arise out of the work itself because its performance creates dangers to others, i.e., inherently dangerous work. Id. at 279. "If the work to be performed fits into one of these two categories, the employer may delegate the *work* to an independent contractor, but he cannot delegate the *duty*." (Emphasis sic.) Id. In other words, the employer is not insulated from liability if the independent contractor's actions result in a breach of the duty. Id.

{¶ 115} R.C. 1309.609 allows a secured party to repossess its collateral only if the secured party can accomplish the repossession without a breach of peace. Thus, the secured party has a statutory duty to avoid breaching the peace. *Leighty v. Am. Can Credit Union* (Dec. 9, 1982), 8th Dist. No. 44496, 1982 WL 2574 ("Should a creditor seek to utilize the statutorily conferred right to self-help in recovering its collateral, it is incumbent upon that creditor to ensure that the means utilized do not constitute a breach of the peace"). See also *Clark*, 877 F.Supp. at 1448 (the Tennessee version of former U.C.C. 9–503 imposed "a definite statutory obligation to take precautions against a breach of the peace"); *MBank El Paso, N.A.*, 836 S.W.2d at 153 ("[Former] section 9–503 of the UCC imposes a duty on secured creditors pursuing nonjudicial repossession to take precautions for public safety"); *Gen. Fin. Corp. v. Smith* (Ala.1987), 505 So.2d 1045, 1048 ("By implication, [ ] a secured party is under a duty to take those precautions which are necessary at the time to avoid a breach of the peace.");

*Rand v. Porsche Fin. Servs.* (Ct.App.2007), 216 Ariz. 424, 433, 167 P.3d 111 (Arizona's self-help repossession statute, based on U.C.C. 9–609, "impose[s] the specific safeguard that a creditor not breach the peace if that creditor elects to forgo judicial process when repossessing collateral"); *Sammons v. Broward Bank* (Fla.App.1992), 599 So.2d 1018, 1020 ("The duty to repossess property in a peaceable manner is specifically imposed on a 'secured party' by the uniform commercial code"); *Massengill v. Indiana Natl. Bank* (Ind.App.1990), 550 N.E.2d 97, 99 (the Indiana reiteration of former U.C.C. 9–503 and common law "make it clear that repossession of a secured chattel must be accomplished without breaching the peace. A clear statutory duty is present"); *Nichols v. Metro. Bank* (Minn.App.1989), 435 N.W.2d 637, 640 ("The conditional nature of the secured party's self-help remedies and the language of the [self-help repossession statute] indicate that a secured party must ensure that there is no risk of harm to the debtor and others if the secured party chooses to repossess the collateral by self-help methods").

{¶ 116} Because statutory duties are nondelegable, the secured party who must meet the duty is responsible for the actions of the independent contractor hired to carry out the duty. *Clark*, 877 F.Supp. at 1448; *MBank El Paso, N.A.*, 836 S.W.2d at 153; *Gen. Fin. Corp.*, 505 So.2d at 1048; *Rand*, 216 Ariz. at 434, 167 P.3d 111; *Massengill*, 550 N.E.2d at 99; *Robinson v. Citicorp Natl. Servs., Inc.* (Mo.App.1996), 921 S.W.2d 52, 54–55; *Fulton v. Anchor Sav. Bank, FSB* (1994), 215 Ga.App. 456, 462–463, 452 S.E.2d 208; *Leighty*, 8th Dist. No. 44496, 1982 WL 2574; *Sammons*, 599 So.2d at 1020. Consequently, Ford is liable for ARS's actions.

{¶ 117} Moreover, even if no statutory duty existed, the exception for inherently dangerous work would also render Ford liable. Inherently dangerous work is work that "involves a risk, recognizable in advance, of physical harm to others, which is inherent in the work itself." *Pusey*, 94 Ohio St.3d at 280, 762 N.E.2d 968. The work "must create a risk that is not a normal, routine matter of customary human activity, such as driving an automobile, but is rather a special danger to those in the vicinity arising out of the particular situation created, and calling for special precautions." Id.

{¶ 118} Courts have recognized that self-help repossession constitutes an inherently dangerous activity. *Williamson v. Fowler Toyota, Inc.*, 1998 OK 14, 956 P.2d 858, ¶ 8; *Hester v. Bandy* (Miss.1993), 627 So.2d 833, 841–843; *DeMary v. Rieker* (1997), 302 N.J.Super. 208, 221, 695 A.2d 294. Self-help repossession is a hazardous business because it necessitates activities that appear to the public as theft. Billings, Handling Automobile Warranty and Repossession Cases (2d Ed.) 631, Section 11:20. Whenever a person confiscates the property of another, particularly when the owner believes he is entitled to keep the property, the

potential for a dispute is high, and injury to person or property a foreseeable risk. *DeMary* at 221. Consequently, we conclude that self-help repossession creates a special danger arising out of the situation created by the work, and it calls for special precautions.

{¶ 119} Because self-help repossession is inherently dangerous work, the secured party has a nondelegable duty to ensure that repossessions occur without a breach of the peace. *Williamson,* 1998 OK 14, at ¶ 16; *DeMary,* 302 N.J.Super. at 222, 695 A.2d 294. Therefore, Ford is liable for ARS's actions.

{¶ 120} Consistent with the outcome of the above analysis, the drafters of the U.C.C. have also opined that creditors should be held liable for the actions of the independent contractors that they hire to repossess collateral. In the Official Comment to U.C.C. 9–609, the drafters state, "In considering whether a secured party has engaged in a breach of peace, [ ] courts should hold the secured party responsible for the actions of others taken on the secured party's behalf, including independent contractors engaged by the secured party to take possession of collateral."

{¶ 121} Earlier, we concluded that a question of fact remains regarding whether ARS breached the peace when it repossessed the Premier on January 12, 2006. As Ford has a nondelegable duty to avoid a breach of the peace, Ford is liable for any torts that ARS committed during that repossession. We thus conclude that the trial court erred in granting Ford summary judgment on appellants' claims for conversion of the Premier, the trespass that allegedly occurred on January 12, 2006, and assault.

{¶ 122} In sum, we conclude that the trial court appropriately awarded Ford summary judgment on its breach-of-contract claims. However, we conclude that summary judgment was inappropriate on James's claims for conversion, trespass, and assault and Carolyn's claim for trespass. Accordingly, we overrule James's seventh and Carolyn's fifth assignments of error to the extent that they challenge the trial court's ruling regarding Ford's breach-of-contract claims. We sustain James's seventh and Carolyn's fifth assignments of error to the extent that they challenge the trial court's ruling on James's claims for conversion, trespass, and assault and Carolyn's claim for trespass.

{¶ 123} We next turn to James's eighth and Carolyn's sixth assignments of error. By those assignments of error, appellants argue that the trial court erred in granting Ford leave to sell their vehicles. On September 19, 2006, Ford sought leave of court to sell the Premier and Monterey copurchased by James and R & R as well as Carolyn's Grand Marquis. Apparently, Ford requested this court order to buttress its right under R.C. 1309.610(A) to sell collateral after default. The trial court granted the motion.

{¶ 124} Because the trial court's decision is interlocutory and unrelated to judgments resolving the claims of and against Ford, ARS, and Bob–Boyd, it is not yet ripe for appeal. *Haley,* 2009-Ohio-447, 2009 WL 250871, at ¶ 11–12; *Davis,* 2008-Ohio-3501, 2008 WL 2700008, at ¶ 6. Accordingly, we dismiss James's eighth and Carolyn's sixth assignments of error.

{¶ 125} For the foregoing reasons, in case Nos. 09AP–501 and 09AP–555, (1) we find the first assignments of error moot, (2) we sustain in part and overrule in part the second assignments of error, (3) we overrule the third and fourth assignments of error, (4) we overrule the fifth assignment of error in case No. 09AP–501, (5) we overrule in part and sustain in part the fifth assignment of error in case No. 09AP–555, and (6) we dismiss the sixth assignment of error in case No. 09AP–501.

{¶ 126} In case Nos. 10AP–263 and 10AP–274, (1) we overrule the first assignment of error in case No. 10AP–263, (2) we overrule in part and sustain in part the first assignment of error in case No. 10AP–274, (3) we strike the second and third assignments of error, (4) we overrule the fourth assignment of error in case No. 10AP–263, (5) we strike the fifth assignment of error in case No. 10AP–263 and the fourth assignment of error in case No. 10AP–274 as they relate to ARS, (6) we overrule the fifth assignment of error in case No. 10AP–263 and the fourth assignment of error in case No. 10AP–274 as they relate to Ford, (7) we dismiss the sixth assignment of error in case No. 10AP–263, (8) we overrule in part and sustain in part the seventh assignment of error in case No. 10AP–263 and the fifth assignment of error in case No. 10AP–274, and (9) we dismiss the eighth assignment of error in case No. 10AP–263 and the sixth assignment of error in case No. 10AP–274.

{¶ 127} Given the foregoing, we affirm in part and reverse in part the judgments of the Franklin County Court of Common Pleas, and we remand this case to that court for further proceedings consistent with law and this opinion.

> Judgments affirmed in part
> and reversed in part,
> and cause remanded.

BRYANT and SADLER, JJ., concur.